No. 25-1404

---

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

———◦◦◦◦◉◦◦◦◦———

SANDY HARRIS, JR.,

*Plaintiff-Appellant,*

-against-

NATIONAL GRID USA SERVICE COMPANY, INC.,

*Defendant-Appellee.*

---

*On Appeal from Order and Judgment of the U.S.*
*District Court for the District of Massachusetts, 1:22-cv-11628-Ak*
*Rendered by Hon. Angel Kelley, U.S.D.J.*

---

## BRIEF FOR THE PLAINTIFF-APPELLANT
## &
## ADDENDUM

---

RESPECTFULLY SUBMITTED,

**SANDY HARRIS, JR.**

BY HIS ATTORNEYS:

| **Law Office of ALAN H. CREDE, P.C.** | **LAW OFFICE OF ROBERT S. MANTELL** |
|---|---|
| 185 Devonshire Street, Suite 302 | 47 Liberty Avenue |
| Boston, MA  02110 | Somerville, MA  02110 |
| (617) 648-8263 | (617) 470-1033 |
| alan.crede@credelaw.com | RMantell@TheEmploymentLawyers.com |
| 1st Cir. Bar No. 1195128 *Attorneys for* | 1st Cir. Bar No. 31754 |
| *Plaintiff-Appellant* | *On the brief* |

<u>TABLE OF CONTENTS -- BRIEF</u>

*Page*

TABLE OF AUTHORITIES ................................................................................ iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................................... viii

JURISDICTIONAL STATEMENT ....................................................................... 1

STATEMENT OF THE ISSUES ........................................................................ 1

STATEMENT OF THE CASE ........................................................................... 1

SUMMARY OF THE ARGUMENT ...................................................................... 9

ARGUMENT ............................................................................................... 14

    I.    STANDARD OF REVIEW ................................................................... 14

    II.    THERE WAS SUFFICIENT EVIDENCE SUPPORTING PLAINTIFF'S CHAPTER 151B CLAIM .............................................. 14

        A.  THE "BUT-FOR" STANDARD CONTROLS, WHICH THE LOWER COURT MISAPPLIED ...................................... 15

        B.  A BURDEN-SHIFTING ANALYSIS APPLIES ............................ 17

            1.  The Prima Facie Case ......................................................... 19

                a.  Plaintiff Was in a Protected Class in that he Had a Good Faith, Reasonable Belief That he was Entitled to a Reasonable Accommodation ................. 19

                    i.    A jury could find that Plaintiff reasonably believed that he was handicapped ...................................... 20

                    ii.    A jury could find Plaintiff reasonably considered himself to be qualified .................. 22

                    iii.    A jury could find that Plaintiff reasonably believed himself capable of performing the essential functions ................. 25

i

iv. Plaintiff requested the reasonable accommodation of remote work ..................... 26

v. Plaintiff reasonably and in good faith believed that the requested accommodation was consistent with the essential functions of his job .......................... 29

b. Plaintiff Suffered an Adverse Action ......................... 34

c. Plaintiff Has Satisfied His Burden of Supplying Minimal Evidence of Causation ................................. 34

i. Two Day Gap Between Request for Remote Work and Threat to Terminate ................................. 35

ii. Three-week gap between request for reasonable accommodation and termination ....................................... 37

iii. Combination of Satisfactory Work Performance With Continued Need for Plaintiff's Work ............................................. 37

2. Defendant's Articulated Reasons ......................................... 38

3. Defendant's Articulated Reasons ......................................... 38

a. Plaintiff Has Ample Affirmative Evidence to Show that One of the Reasons for Plaintiff's Termination Was Retaliation ..................................... 41

i. Plaintiff's Request for Reasonable Accommodation Was Discussed at the Termination Meeting ...................................... 41

ii. Defendant's Hostility Toward Plaintiff's First Request for Remote Work ...................... 41

iii. Defendant Terminated Plaintiff, Knowing that He Was Willing to Return

ii

to Work If His Request for Reasonable
Accommodation Was Denied .......................... 45

    iv.    Disparate Treatment in the Way Plaintiff
was Terminated Without Warning.................. 47

    v.    Hostility Toward Plaintiff's Request for
FMLA Leave..................................................... 48

  b.  Plaintiff has Proved that One or More of
Defendant's Articulated Reasons Are Pretext ........... 49

    i.    Defendant has Changed Its Story,
Having Told the MCAD Completely
Different Reasons for Discharge..................... 50

    ii.    Plaintiff Was Not Responsible for Storm
Duties .............................................................. 51

  4.  Plaintiff Has Established a Strong Case Under the
Burden-Shifting Framework .................................................. 52

  5.  The District Court Analyzed the Case Improperly .............. 52

III.    PLAINTIFF HAS INTRODUCED SUFFICIENT EVIDENCE
TO SUPPORT HIS FMLA CLAIM........................................................ 56

CONCLUSION.................................................................................................. 59

REQUEST FOR ATTORNEYS' FEES ......................................................... 59

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .......................... 61

CERTIFICATE OF SERVICE ....................................................................... 62

ADDENDUM

iii

## TABLE OF AUTHORITIES

**CASES:**

Bart v. Golub Corp., 96 F. 4th 566 (2d Cir. 2024) ............................................ 40

Bostock v. Clayton County, 590 U.S. 644 (2020) .................................... 15, 16

Brennan v. GTE Gov't Sys. Corp., 150 F.3d 21 (1st Cir. 1998) .................................. 47

Bulwer v. Mount Auburn Hosp., 473 Mass. 672 (2016) ........................................ 19, 24

Capps v. Mondelez Global, LLC, 847 F.3d 144 (3d Cir. 2017) .............................. 27, 48

Cargill v. Harvard Univ., 60 Mass. App. 585, 600 n.14 (2004) .............................. 29,33

Che v. MBTA, 342 F.3d 31 (1st Cir. 2003) ........................................................... 34, 53

Chief Justice for Admin. & Mgmt. of the Trial Court v. MCAD, 439 Mass. 729
(2003) ....................................................................................................... 16, 39, 40

Connolly v. Woburn Public Schools, 659 F. Supp. 3d 92, 111 (D. Mass. 2023) ......... 21

DaPrato v. MWRA, 482 Mass. 375 (2019) .................................................................. 15

Dartt v. Browning-Ferris Indus., Inc. (Mass.), 427 Mass. 1 (1998) ........................... 15

DeCaire v. Mukasey, 530 F.3d 1 (1st Cir. 2008) ........................................................ 35

Duckworth v. Pratt & Whitney, Inc., 152 F.3d 1 (1st Cir. 1998) ............................... 57

Gannon v. Boston, 476 Mass. 786 (2017) .................................................................... 13

Harrington v. Aggregate Industries-Northeast Region, Inc., 668 F.3d 25 (1st
Cir. 2012) ................................................................................................................ 14, 47

Hodgens v. General Dynamics Corp., 144 F.3d 151 (1st Cir. 1998) .......................... 56

Holtz v. Rockefeller & Co., 258 F.3d 62 (2d Cir. 2001) ............................................. 39

International Bhd. of Teamsters v. U.S., 431 U.S. 324 (1997) .................................... 38

Joseph v. Lincare, Inc., 989 F.3d 147 (1st Cir. 2021) ................................................. 40

Kelley v. Corr. Med. Servcs., 707 F.3d 108 (1st Cir. 2013) ....................................... 17

King v. Boston, 71 Mass. App. 460 (2008) .................................................................. 35

Kinney v. St. Mary's Health, Inc., 76 F.4th 635 (7th Cir. 2023) ................................. 30

iv

Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105 (1st Cir. 2024)...................... 14, 41, 55

Lin v. CGIT Systems, Inc., 2021 U.S. Dist. Lexis 179695 (D. Mass.)........................ 21

Lipchitz v. Raytheon Co., 434 Mass. at 505-506 (2001)..................... 15, 18, 39, 40, 52

Mariani-Colon v. Dept. of Homeland Sec., 511 F.3d 216 (1st Cir. 2007) ............ 35, 37

MCAD & Joseph v. Mass. Dept. of Children and Families, 2023 Mass. Comm. Discrim. Lexis 3.................................................................................................. 32

Melo v. Somerville, 953 F.3d 165 (1st Cir. 2020)....................................................... 31

Milman v. Fieger & Fieger, P.C., 58 F.4th 860 (6th Cir. 2023) ................................. 56

Moore v. Indus. Demolition LLC, 2025 U.S. App. Lexis 11530 (1st Cir.)14, 15, 20, 29

O'Brien v. MIT, 82 Mass. App. 905 (2012) ................................................................ 49

Pardo v. General Hosp. Corp., 446 Mass. 1 (2006)................................................... 35

Patterson v. McLean Credit Union, 491 U.S. 164 (1989) .......................................... 39

Pearson v. MBTA, 723 F.3d 36 (1st Cir. 2013) .......................................................... 53

Peeples v. Clinical Support Options, Inc., 487 F. Supp. 3d 56 (D. Mass. 2020) ......... 21

Perez v. Thorntons, Inc., 731 F.3d 699 (7th Cir. 2013)............................................. 25

Reeves v. Sanderson Plumbing Products, 530 U.S. 133 (2000) ........................... 18, 19

Ripoli v. R.I. Dept. of Hum. Servs., 123 F.4th 565 (1st Cir. 2024) ............................ 18

Samson v. Federal Exp. Corp., 746 F.3d 11196 (11th Cir. 2014) .............................. 31

Scarlett v. Boston, 93 Mass. App. 593 (2018)...................................................... 50, 51

Shellenberger v. Summit Bancorp, 318 F.3d 183 (3rd Cir. 2003)................................ 20

Silver v. Alexandria, 470 F. Supp. 3d 616 (W.D. La. 2020) ...................................... 21

Smith v. Bell Atlantic, 63 Mass. App. 702 (2005) ................................................ 29, 30

Snyder v. Louisiana, 552 U.S. 472 (2008).................................................................. 40

Soileau v. Guilford of Me., 105 F.3d 12 (1st Cir. 1997).............................................. 20

Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011 (8th Cir. 2005)............................ 20

Stroup v. United Airlines, Inc., 26 F.4th 1147 (10th Cir. 2022) ................................. 40

v

Surprise v. Innovation Group, Inc., 925 F. Supp. 2d 134 (D. Mass. 2013) ................ 20

Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981) ................................... 39

Torrech-Hernandez v. GE, 519 F.3d 41 (1st Cir. 2008) .............................................. 25

Trustees of Forbes Library v. Labor Relations Comm'n, 384 Mass. 559 (1981)........ 15

Tufts Medical Center v. Dalexis, 103 Mass. App. 386 (2023).............................. 30, 32

Velazquez-Fernandez v. NCE Foods, Inc., 476 F.3d 6 (1st Cir. 2007) ....................... 37

Rodriguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52 (1st Cir. 2005) .......... 37

Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., 474 Mass.
382 (2016)........................................................................................... 17, 18, 19, 38

Wright v. CompUSA, Inc., 352 F.3d 472 (1st Cir. 2003)............................................ 15

**STATUTES:**

28 U.S.C. § 1291.......................................................................................................... 1

28 U.S.C. § 1331.......................................................................................................... 1

29 CFR 825.702(c)(2).................................................................................................. 27

29 U.S.C. §§ 2612(a)(1)(C) & (D)............................................................................... 56

29 U.S.C. §§ 2615(a)(1) & (2)..................................................................................... 56

29 U.S.C. § 2617(a)(3) ................................................................................................ 59

G.L. c. 151B, § 1(16).................................................................................................. 23

G.L. c. 151B, § 1(17).................................................................................................. 20

G.L. c. 151B, § 1(20).................................................................................................. 21

G.L. c. 151B, §4(4) & 4(4A) ...................................................................................... 14

G.L. c. 151B, § 4(16).................................................................................... 21, 22, 29

G.L. c. 151B, §9......................................................................................................... 59

**OTHER AUTHORITIES:**

D.B. Dobbs, Torts § 168 (2001) ................................................................. 15

Employer, § "How Are Essential Functions Determined ............................................. 30

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiff-Appellant Sandy Harris respectfully requests oral argument with respect to this appeal. This case is factually dense. The parties' Combined Statement of Material Facts and Responses is ninety-four (94) pages. (A.1380-1473). Mr. Harris believes that oral argument on appeal would assist the court in clarifying the record for the Court.

## JURISDICTIONAL STATEMENT

This is an appeal from an order of the United States District Court for the District of Massachusetts (Kelley, D.J.) entered on March 26, 2025, granting summary judgment to Defendant National Grid USA Service Company, Inc. ("National Grid").  The district court had jurisdiction under 28 U.S.C. § 1331. Plaintiff Sandy Harris ("Harris") filed a timely notice of appeal. Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291, as it is an appeal from a final order.

## STATEMENT OF THE ISSUES

1.      Whether Harris has submitted evidence sufficient to raise a genuine issue of material fact that he was terminated for requesting a reasonable accommodation.

2.      Whether Harris has submitted evidence sufficient to raise a genuine issue of material fact that he was terminated based on the perceived likelihood that he would request FMLA leave based on his medical condition.

## STATEMENT OF THE CASE

National Grid is a gas and electric utility which provides services in Massachusetts, Rhode Island and New York. (A1380,A55).  Plaintiff Harris began working at National Grid in 2017. (A1381,A88).  He was a Change Analyst – someone who helps manage the transition to new technology. (A1425,A1031).

1

There were more than a dozen other Change Analysts within the Gas Business Enablement ("GBE") program. (A1418,A1032,A151-52).

On March 9, 2020, Reihaneh Irani-Famili, Vice President of GBE, met with Plaintiff. (A1417,A653). She told him that he was a great asset to the team, that his career was just getting started, that "good things were coming," and that he had a "bright future" at National Grid. (A1417,A1041,A656). At this point, Irani-Famili believed that Plaintiff had the potential to take on many roles within the GBE organization or any other organization. (A1418,A652).

About a week after the March 9, 2020 meeting, National Grid told office workers to work remotely indefinitely because of the COVID pandemic and Plaintiff shifted to fully remote work. (A1419,A1050). On April 2, 2020, Plaintiff's immediate manager, Trina Dombrowski gave him his annual performance review. (A1420,A814). As Dombrowski testified, "It was a good review." (A1420,A814). Dombrowski concluded the written review with the words, "I believe Sandy is capable of delivering excellent results in exactly the right ways and I look forward to seeing him grow in this role and into what could be a very positive career at National Grid." (A1421,A1077). Plaintiff's next-level manager, Jesse Harvey, passed on the "positive sentiment" surrounding the review to Irani-Famili. (A1421,A560-61).

2

On July 22, 2020, Plaintiff was out-of-state visiting family on a two-week vacation. (A1422,A867-68). His vacation was scheduled to end July 27. (A1422,A124-25). His manager Dombrowski was aware of and had approved this vacation. (A1422,A867-68,A1033).

On July 22, 2020, Dombrowski contacted Plaintiff to request Plaintiff's attendance at an in-person training at National Grid's location in Providence, RI on July 28 and 29. (A1422-23,A1082,A869-71). This call was the first time that Plaintiff became aware of any desire for him to be on-site for the Providence training. (A1423,A873-75,A1032-33).

Plaintiff told Dombrowski that he was not comfortable doing the in-person training, that he could not do it, requested a reasonable accommodation so that he would not have to attend in person, and, in response, Dombrowski told him to "contact medical." (A1424-25,A805-06,A875-77,A1024).

The idea of Plaintiff attending the training in-person was moot, because there was a mandatory two-week quarantine period for travelers returning from out-of-state. (A1430,A806,A857). Defendant's Employee Health Dept. confirmed the quarantine. (A1427,A1086). Plaintiff relayed this information to Dombrowski in a July 28, 2020 email where he also told her, "The representative was sure to inform me that as an office employee I am not required to be on-site at National Grid facilities due to COVID-19 concerns," and said he was looking to work

3

remotely out-of-state under a National Grid policy promulgated by National Grid executive Terry Sobolewski. (Id.)

The Providence training proceeded as scheduled on July 28 and 29, 2020. (A1432,A803,A686-87). The training was led by a PricewaterhouseCoopers ("PWC") consultant, who appeared virtually, in accordance with PWC's policy, which forbade its consultants from being on-site during COVID. A1432,A1033). A National Grid employee, Ken Fure, attended and distributed the iPads, as Plaintiff had been asked to do. (A1432,A1033,A803,A686-87).

Two days after Plaintiff's request for remote work, on July 30, 2020, Vice President of Human Resources Judy Dunn sent Plaintiff, who she knew was on the other side of the country, an email saying if Plaintiff did not report to work by July 30 – the very same day the email was sent – he would be deemed to have resigned his job. (A1432,A956,A1228). The letter also offered Plaintiff nine weeks' severance if he resigned and signed a release of claims. (Id.)

Plaintiff replied to Dunn the same day, saying, in part, that if his request to work remotely were not approved, "…I will drive to MA immediately." (A968,A1231). Plaintiff also requested remote work as a "reasonable accommodations due to COVID," citing "pre-existing health conditions" which place him at a "higher risk for COVID." (Id.)

4

On the evening of July 30, Dunn emailed Plaintiff back. (A1435,A970,A1231). She stated that Plaintiff was in violation of the "terms and conditions" of his employment because the "essential functions" of his job required him to provide on-site services. (Id.) She described Plaintiff's request for reasonable accommodation as "nonexistent" and therefore "not approved." (Id.) When queried at her deposition about how Plaintiff's request was "nonexistent," given that he had previously made reasonable accommodation requests to both Dombrowski and Dunn herself, Dunn testified that she considered those requests "non-existent" because "he didn't ask for that before he left the service territory." (A1436,A970-71).  Dunn's response departed from National Grid's reasonable accommodation policy, which does not permit requests for reasonable accommodation to be denied because the request had not been made at some earlier time and, further, contemplates an explanation in writing for why the request was denied and an alternative proposal. (A1439,A1174,A1239,A1171).

Later in the evening of July 30, Plaintiff replied to Dunn's email, disputing that his request for reasonable accommodation had not been previously made, outlining how the request to work onsite at Providence was first made while he was on vacation, and stating that he had not abandoned his job. (A1438,A977-78,A1235).

5

Defendants then assigned Plaintiff fully remote work. (A1440,A585). Plaintiff continued to perform these remote functions until his termination. (A1441,A592-93).

On August 4, Dunn emailed Plaintiff, attaching a draft severance offer. (A1442,A984-85,A1249). Plaintiff replied the same day, stating, among other things, that he did not intend to lose his job by requesting a reasonable accommodation and indicating that he was able to do his job fully remotely. (Id.) Dunn replied to that email by repeating the fiction that Plaintiff's request for reasonable accommodation was nonexistent, telling Plaintiff that, "Your management is not allowing you to work remotely out of state. That was never requested and is denied." (A985,A1249).

Dunn went on to state that, "The expectation is that you are in Massachusetts, to be on-site as needed, per your job and storm duty requirements." (A1443,A1249). Storm duties are duties most National Grid employees have, requiring them to report to work during major storms. (A1443,A1184). But Plaintiff and his entire group, GBE, were completely exempt from storm duties. (A1443,A858,A578-80).

Plaintiff reiterated in response the need to consider a reasonable accommodation due to COVID-19 and his preexisting conditions. (A1443,A984-86,A1249). Dunn then instructed Plaintiff on how to proceed with his request for

reasonable accommodation through Defendant's Employee Health Department. This occasion marked the first time Dunn instructed Plaintiff on how to proceed with a reasonable accommodation request. (A1443,A988-89,A1231,A1252).

On August 6, Plaintiff replied, informing Dunn of multiple people in Employee Health with whom he had spoken. (A1444,A1256).  He also inquired about his eligibility for leave under FMLA, citing his desire to work remotely both for his own health and to care for his elderly parents. (A1444,A990-91,A1256). Dunn asked Plaintiff to review the proposed severance offer and improperly failed to counsel Plaintiff with regard to how he would perfect a request for FMLA leave. (A1445,A991-92,A1256).

On August 6, Plaintiff began the process of applying for FMLA through Sedgwick Claims Management ("Sedgwick"). (A1446,A1033).  While initially Plaintiff sought leave to care for his mother, Plaintiff also expressed interest in applying for leave for his own medical condition. (A1446-47,A1034).

According to the testimony of Dunn, one of the two decisionmakers in Plaintiff's ultimate termination, there were no decision to terminate Plaintiff at this time. (A1445,A994,A1462).

On August 11, 2020, Dunn emailed Plaintiff, telling him that, "[Y]ou have violated the terms and conditions of your employment." (A1447,A1002-04,A1261).  Plaintiff responded that he believed a doctor's note had already been

sent to Employee Health and, that same day, Plaintiff's primary care physician faxed a letter to Employee Health saying that, in his medical opinion, Plaintiff should be permitted to work remotely as an accommodation and inviting National Grid to call him with any questions. (A1449,A1005,A1264,A1266,A1312-13,A1350).  Plaintiff also sent Dunn an email saying that it was his "sincere desire" to continue to work for National Grid and it was his intent to return to Massachusetts by the end of the month. (A1450,A1002,A1261).

The next day, August 12, Dunn directed Sarah Lavalle of Employee Health to send out a letter to Plaintiff requesting more medical documentation and Lavalle sent Plaintiff the letter. (A1450,A1323-24,A1352-53).  The letter stated, "Please have your doctor submit all medical documentation regarding your reasonable accommodation request to the email address listed below by close of business on August 18, 2020." (A1451-52,A1323-24,A1352). Plaintiff was never warned, either by the letter or other source, of any consequences for failure to provide supplemental documentation on time. (A1452-54,A1352,A1324-25,A1454,A1157). The deadline of August 18 was shorter than Defendants usually imposed on those providing additional medical information. (A1455,A1203,A1155).

Plaintiff worked diligently to obtain additional documentation but his doctor's office was overwhelmed by COVID, and was not able to provide the documents by the August 18 deadline. (A1456,A128-29,A1316,A1210).

On August 18, Dunn established a plan that if Plaintiff did not provide supplemental documentation by that evening, the Plaintiff would be terminated on 8:00 am the next morning. (A1460,A1019,A1020,A1362). The next morning, August 19, 2020, at 8:07 a.m., Dunn emailed Plaintiff a notice of termination. (A1461,A1021-23,A1364). Dunn and Irani-Famili, the two decision makers in Plaintiff's termination, were aware of Plaintiff's pending request for reasonable accommodation at the time of the termination. (A1462,A997-98,A717,A1015-16). Plaintiff's request for reasonable accommodation, to be able to work remotely, was neither accepted or rejected.

## SUMMARY OF THE ARGUMENT

A reasonable jury could find that Defendant terminated Plaintiff in retaliation for his request to work remotely as a reasonable accommodation. Chapter 151B prohibits retaliation against an employee for requesting a reasonable accommodation. (14). Plaintiff need only prove that retaliatory bias was a "but-for" cause to establish liability, although the Court below improperly applied a more stringent standard (15-17).

9

A burden-shifting analysis demonstrates that there is a genuine issue of material fact that Plaintiff was terminated in whole or in part based on retaliation. (17-19). Plaintiff engaged in protected activity in that he reasonably and in good faith believed himself to be entitled to a reasonable accommodation. (19-20). He reasonably believed himself to be handicapped, during the worst days of the COVID pandemic, given that he was a long-time smoker with severe throat and lung conditions, which caused him lung pain and intermittent fainting. (20-22). Plaintiff reasonably considered himself to be qualified, given a recent, positive performance evaluation, and contemporaneously communicated statements of his good performance, including from a Vice President three levels above him. (22-25). Given that record of positive performance and the fact that Plaintiff was willing to return to work in any capacity desired by Defendant, pending the determination of his request for reasonable accommodation, Plaintiff reasonably believed himself capable of performing the essential functions of the job. (25-26).

Plaintiff repeatedly voiced the request of remote work as a reasonable accommodation, initiated a formal request for accommodation through the appropriate process, and submitted a doctor's note in support of his request. (26-29).  Plaintiff believed that his request for remote work was reasonable, given that he ordinarily worked remotely part-time anyway, others in his job category worked fully remotely, there was no requirement for on-site work in his job description, he

10

had been working fully remotely for months, and there was a standing directive at Defendant that office workers such as Plaintiff were to work fully remotely. (Id.).

Plaintiff completed his prima facie burden in three, independently sufficient ways, by showing [1] a two day gap between his request for remote work and the threat to separate him from employment (34-36); [2] a short three week gap between his request for reasonable accommodation of remote work and his termination (36-37); and/or [3] the combination of satisfactory work history along with a continuing need for his work (37-38).

Plaintiff has provided five types of affirmative proof establishing that retaliation was one of the reasons for his termination, including that [1] his request for reasonable accommodation was discussed at the meeting in which Defendant decided to fire him, demonstrating it to be a consideration in that decision (41); [2] Defendant reacted with immediate hostility in response to Plaintiff's initial request for remote work, threatening him with imminent separation of employment, claiming absurdly that his requests for reasonable accommodation were "non-existent," pushing him to sign severance instead of advising him of how he could perfect his requests for reasonable accommodation, blaming him for missing a training which was impossible for him to attend and for which he was never scheduled, and accusing him of violating policy when Defendant itself had communicated a directive that all office workers should work remotely (41-45); [3]

11

Defendant states that it terminated Plaintiff for failing to return to work on-site; however, Plaintiff had clearly stated that if his request for reasonable accommodation were denied, he would return to work immediately and voluntarily, but Defendant did not give him a chance to do so (45-47); [4] Defendant violated its own practices and policies by establishing an unusually short deadline for Plaintiff to submit medical documentation in support of his request for accommodation, and then terminating him without warning when he missed the deadline (47-48); and [5] Defendant responded to Plaintiff's request for FMLA leave with overt hostility, and argued against its use as opposed to identifying for Plaintiff the process he should use to formally request it (48-49).

In addition, to this affirmative evident of retaliatory bias, Plaintiff has shown that at least five reasons given for his termination were pretextual. Defendant told the MCAD that Plaintiff was terminated for his attitude, violation of expense policies, missing a meeting, and failure to report the loss of a cell phone; however, a decisionmaker later testified that <u>none</u> of these were factors in the termination decision. (50-51). Defendant explained its anger towards Plaintiff as reflecting his failure to be available for storm duties; however, Plaintiff, like everyone in his department, was exempt from storm duties (51).

The District Court improperly ignored this strong prima facie evidence, evidence of retaliatory hostility and additional proof of pretext, and in many instances, improperly found facts that favored Defendant. (52-56).

Plaintiff likewise supports his case of FMLA retaliation. Much of the analysis for this claim tracks that of the claim described above. The FMLA applies when an employer terminates an employee because it thinks that the employee will request FMLA leave. (56-57). Plaintiff indicated an intent to request FMLA leave multiple times, and actually initiated a request for leave under Defendant's formal process. (56-59). He was qualified for his job, and he was terminated only two weeks after first expressing an intent to apply for FMLA leave. (Id.).

The affirmative evidence of hostility towards requests for reasonable accommodation described above, as well as Defendant's numerous pretextual explanations for its conduct support Plaintiff's FMLA retaliation claims. In addition, on the eve of Plaintiff's termination, Defendant's agents were on "high alert" as to whether he had submitted documentation in support of an FMLA leave, so that Defendant could terminate Plaintiff the minute he missed a deadline for submitting documents in support of his reasonable accommodation request. (58). A prima face case, proof of retaliatory hostility and incredibly strong evidence of pretext supports the FMLA retaliation claim, as well as the c. 151B claim.

13

**ARGUMENT**

I.      STANDARD OF REVIEW

This Court's review of a district court's grant of summary judgment is *de novo*. Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 108 (1st Cir. 2024). When reviewing the dismissal of claims, this Court must view the evidence in the light most favorable to the plaintiff and draw all reasonable inferences in his favor. Id. "Courts should be especially cautious before granting summary judgment when pretext and retaliatory animus are at issue." Harrington v. Aggregate Industries-Northeast Region, Inc., 668 F.3d 25, 33 (1st Cir. 2012).  In this case, the order granting summary judgment should be reversed, because a reasonable jury could find that Plaintiff's termination was retaliatory.

II.     THERE WAS SUFFICIENT EVIDENCE SUPPORTING PLAINTIFF'S CHAPTER 151B CLAIM

In Count III of the Complaint, Plaintiff claims that he was terminated in retaliation for requesting that he be permitted to work remotely as a form of reasonable accommodation. If proven, such conduct would violate G.L. c. 151B's prohibitions against retaliation and interference with rights. G.L. c. 151B, §4(4) & 4(4A). It is unlawful for an employer to fire an employee because he has requested a reasonable accommodation. Moore v. Indus. Demolition LLC, 2025 U.S. App. Lexis 11530 (1st Cir.) at 21 (construing c. 151B, and stating, "requesting an accommodation [is] protected activity sufficient to support a retaliation claim");

14

Wright v. CompUSA, Inc., 352 F.3d 472, 477-478 (1st Cir. 2003). More specifically, it is unlawful to terminate an employee for requesting a reasonable accommodation if he reasonably, and in good faith believed himself to be entitled to it. Moore, 2025 U.S. App. Lexis 11530, at 19-20, 26. Plaintiff will review the standards applicable to his c. 151B claim, with the understanding that many of these principles will also apply to his FMLA retaliation claim, as well.

A.    THE "BUT-FOR" STANDARD CONTROLS, WHICH THE LOWER COURT MISAPPLIED

Under c. 151B, the plaintiff is not required to prove that retaliation was the sole cause for the discharge. Lipchitz v. Raytheon Co., 434 Mass. at 505-506 & n.19 (2001); Dartt v. Browning-Ferris Indus., Inc. (Mass.), 427 Mass. 1, 7-8 (1998). "Nothing is the result of a single cause in fact." Lipchitz, 434 Mass. at 506 n.19, quoting D.B. Dobbs, Torts § 168, at 410 (2001).

Rather, the plaintiff need only prove that "retaliation must have been [a] but for cause." Lipchitz, 434 Mass. at 505, citing Trustees of Forbes Library v. Labor Relations Comm'n, 384 Mass. 559, 562-563 (1981); see also DaPrato v. MWRA, 482 Mass. 375, 384-385 (2019) (but-for standard applies to c. 151B claim where an employee was fired in retaliation for using reasonable accommodation).

"[T]he traditional but-for causation standard means a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged decision." Bostock v. Clayton County, 590 U.S. 644, 656 (2020). A plaintiff need

15

only show that the termination was based "in part" on retaliation, and need not show bias to be the only, or even the primary reason. Id. at 665. But-for is a "sweeping standard," because "[o]ften, events have multiple but-for causes." Id. at 656. For example, while an error in the ninth inning may be a "but for" reason why a team lost a close baseball game, so might dozens of other plays made throughout the game. Thus, personnel decisions based on a mixture of legitimate and illegitimate considerations will violate the law, where an unlawful reason is a determinative factor. Chief Justice for Admin. & Mgmt. of the Trial Court v. MCAD, 439 Mass. 729, 735 (2003) ("Because [personnel] decisions are seldom made for a single reason, discriminatory and nondiscriminatory . . . motives may coexist in the mind of a decisionmaker").

The Court below made two serious errors with respect to the causation standard.  First, the motion judge held that a "retaliation claim cannot rely solely on evidence that the protected activity was one factor among many in the employer's decision." (A.1520).  This statement is false. Rather, so long as unlawful bias is one but-for cause out of "multiple but-for causes," "that is enough to trigger the law." Bostock, 590 U.S. at 656. This is so, even if there were "many" other reasons, too.

Second, the motion judge asserted that "[Plaintiff] claims he was terminated solely due to his accommodation request." (A.1521).  Again, this is false. While

16

Plaintiff argued that the evidence was sufficient to establish retaliation to be the sole reason, he made it clear that he prevails if bias was merely "a part" of Defendant's motive. Plaintiff clearly asserted his entitlement to the but-for standard. He wrote:

> All of the foregoing suggests National Grid decided to terminate Plaintiff solely because of his request for accommodation. However, in a Chapter 151B retaliation claim, the termination (or other adverse employment action) need not be motivated solely, or even primarily, by the protected activity; it is sufficient if the termination is motivated "at least in part" by the protected activity. Ruffino v. State Street Bank & Trust Co., 908 F. Supp. 1019, 1040 (D. Mass. 1995) ("motivated, at least in part"); *Massachusetts Superior Court Civil Jury Instructions* §5.29 ("Retaliation") ("motivated, at least in part"). Thus, **even if Harris' termination had other causes**, such as travel expenses or lost phones, **but was motivated at least in part by his request for reasonable accommodation**, **a claim for retaliation will lie under 151B**. Id.

(A.413). (emphasis added). Thus, reversal is required, as the lower court made clear errors with respect to the causation burdens it imposed on the plaintiff, including apparent imposition of the "sole" cause standard.

## B.    A BURDEN-SHIFTING ANALYSIS APPLIES

A retaliation claim based on a request for reasonable accommodation is examined using Massachusetts' version of the *McDonnell Douglas* burden shifting framework. Kelley v. Corr. Med. Servcs., 707 F.3d 108, 115 (1st Cir. 2013); Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., 474 Mass. 382, 406 (2016). At the first stage, the plaintiff bears the burden of producing evidence supporting a prima facie case of retaliation – that the plaintiff was in a protected

17

class, suffered some adverse action and that there was some causal connection. Verdrager, 474 Mass. at 406. Next, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. Id. Then, the burden shifts back to the plaintiff at the third stage – what is often called the pretext stage. Id.

The combination of a prima facie case and satisfaction of the third stage allows a jury to infer that "the employer's true motivation was retaliatory." Verdrager, 474 Mass. at 406.  "Massachusetts is a pretext only jurisdiction," meaning that a prima facie case and proof of pretext, by themselves, are sufficient to establish unlawful bias. Id. at 397. This remains true, even if the evidence of pretext does not overtly express hostility towards the plaintiff's protected trait.[1]

As a pretext-only jurisdiction, Massachusetts is more liberal than its Federal counterpart. Under Massachusetts law, the falsity of any of an employer's stated nondiscriminatory reasons is enough for the finder of fact to infer unlawful bias. Lipchitz, 434 Mass. at 501. Under Federal law, while a prima facie case and pretext are "generally" sufficient to prove underlying discrimination or retaliation,[2] more

---

[1] Verdrager, 474 Mass. at 397; Reeves v. Sanderson Plumbing Products, 530 U.S. 133, 144-145 (2000) (pretext evidence was sufficient where the plaintiff was blamed for timekeeping discrepancies where the clock often malfunctioned, and plaintiff was criticized for failing to discipline employees, which was not a function within his authority).

[2] Ripoli v. R.I. Dept. of Hum. Servs., 123 F.4th 565, 572 (1st Cir. 2024).

18

evidence may be necessary where either the prima facie case or pretext showings are particularly weak, in combination with "abundant and uncontroverted independent evidence that no discrimination had occurred." Reeves, 530 U.S. at 148.

Massachusetts also departs from the Federal version of this analysis, in that plaintiffs need not prove "pretext for discrimination" at the third stage. Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 681-682 (2016). The phrase "overstates the plaintiff's burden at the summary judgment stage because Massachusetts is a pretext only jurisdiction." Id. at 681.

As will be shown through this burden-shifting analysis, Plaintiff has sufficient evidence to raise a reasonable inference that he was terminated because he requested the reasonable accommodation of remote work.

1.    The Prima Facie Case

The Plaintiff will first establish that he has satisfied the three elements of a prima facie case of retaliation: (i) that he engaged in protected activity; (ii) that he suffered an adverse action; and (iii) that his protected activity caused an adverse employment action. Verdrager, 474 Mass. at 406.

a.    Plaintiff Was in a Protected Class in that he Had a Good Faith, Reasonable Belief That he was Entitled to a Reasonable Accommodation

19

Under Massachusetts retaliation law, a plaintiff requesting a reasonable accommodation has engaged in protected activity if she reasonably, and in good faith believed herself to be entitled to it. Moore, 2025 U.S. App. Lexis 11530, at 19-20, 26; see also Psy-Ed Corp., 459 Mass. 697, 706 (2011). This is so, even if it later is determined that the employee was not actually disabled or otherwise entitled.[3] Plaintiff will first discuss evidence supporting the fact that he reasonably believed himself entitled to the reasonable accommodation of remote work, such that his request for it was protected by c. 151B.

    i.    A jury could find that Plaintiff reasonably believed that he was handicapped

A reasonable jury could find that Plaintiff was handicapped or that he reasonably believed himself to be handicapped. Examination of the plaintiff's good faith belief in his disability should take into account the fact that the plaintiff is not a legal expert.  Surprise v. Innovation Group, Inc., 925 F. Supp. 2d 134, 142 (D. Mass. 2013). A "handicap" means a physical or mental impairment that substantially limits one or more major life activities. G.L. c. 151B, § 1(17). "Breathing" is one of the major life activities recognized by the statute. G.L. c.

---

[3] Moore, 2025 U.S. App. Lexis 11530, at 21; Soileau v. Guilford of Me., 105 F.3d 12, 16 (1st Cir. 1997); Shellenberger v. Summit Bancorp, 318 F.3d 183, 191 (3rd Cir. 2003).

151B, § 1(20). Handicap may be determined in light of the combination of impairments.  29 CFR Part 1630 Appendix, section 1630.2(j)(1)(ii).

The existence of a handicap is determined in light of the context of the times, including the COVID-19 pandemic. <u>Silver v. Alexandria</u>, 470 F. Supp. 3d 616, 622 (W.D. La. 2020). In the context of COVID-19, many courts have recognized respiratory issues, and other risk factors, as a disability.[4] Chapter 151B protects both handicapped people, as well as those who are "alleging" that they are handicapped. G.L. c. 151B, § 4(16) (It is unlawful "[f]or any employer . . . to dismiss from employment . . . any person *alleging* to be a qualified handicapped person, capable of performing the essential functions of the position with reasonable accommodation") (emphasis added).

In this case, Plaintiff was a long-time smoker, whose smoking has led to throat, lung and breathing issues, such a lung pain and intermittent fainting (A1406,A88,A460, A1044-45,A1055,A1047-49,A1067). Plaintiff's afflictions directly affect the major life activity of breathing. G.L. c. 151B, § 1(20). His belief with respect to his impairments is supported by a doctor's note of August 11, 2020 from Dr. Jose Guerra of Beth Israel Lahey Health, which endorsed Plaintiff's request for an "accommodation to work remotely during the COVID pandemic."

---

[4] <u>Peeples v. Clinical Support Options, Inc.</u>, 487 F. Supp. 3d 56 (D. Mass. 2020); <u>Lin v. CGIT Systems, Inc.</u>, 2021 U.S. Dist. Lexis 179695 (D. Mass.), at 11; <u>Connolly v. Woburn Public Schools</u>, 659 F. Supp. 3d 92, 111 (D. Mass. 2023).

(A1406,A88,A1449,A1266,A1312-13,A1350). The District Court assumed that Plaintiff was disabled under G.L. c. 151B, § 4(16), and certainly never found that Plaintiff's *belief* in the existence of disability to be irrational or in bad faith. (A.1515).

To be sure, the district court questioned Plaintiff's disability status, based on a certification he submitted to Defendant on November 14, 2017, at the outset of his employment, and *before* the COVID pandemic. (A1515, A1381,A100-01,A88). However, that certification is not dispositive, in that it does not certify to a lack of disability in the context of COVID, which later emerged, nor does it take into account his medical situation two and a half years later. Peeples, 487 F. Supp. 3d at 62-63 (holding that an employee with moderate asthma was disabled because risks that emerged in the COVID era). That certification from 2017 is close to irrelevant with respect to whether Plaintiff reasonably and in good faith believed himself to be disabled in the summer of 2020, at the height of a deadly pandemic. Consequently, a jury could find that Plaintiff reasonably and in good faith believed himself to be disabled as to qualify for entitlement to reasonable accommodation.

    ii.    A jury could find Plaintiff reasonably considered himself to be qualified

A reasonable jury could find Plaintiff qualified to perform his job with reasonable accommodation, or in the alternative, that he reasonably believed himself to be so qualified. A qualified handicapped person is defined as a person

with a disability who is capable of performing the essential functions of a job with reasonable accommodation. G.L. c. 151B, § 1(16). This brief will first address Plaintiff's underlying capacity to perform his job, and then will later address essential functions.

Plaintiff was qualified to perform his work as a Change Analyst within the GBE Program. He served in that role from December 2, 2017 through August 19, 2020. (A1381,A88). Plaintiff received a good annual performance evaluation on April 2, 2020. (A1420,A814). According to the review, Plaintiff is "welcoming and knowledgeable," sets "the right tone," "is a "reliable resource," and "did a nice job building a rapport with key stakeholders, and has received positive feedback." (A1421,A1077). Trina Dombrowski, Plaintiff's direct manager and the author of his review, described it as a "good review." (A1420,A814).

The review concludes with the words, "I believe [Plaintiff] is capable of delivering excellent results in exactly the right ways." (A1421,A1077). The "positive sentiment" endorsed by the review was communicated to Reihaneh Irani-Famili, Vice President of Business Readiness for Transformation, three levels above Plaintiff. (A1421,A560-61). Plaintiff's former direct manager and later skip-level supervisor, Jesse Harvey, testified that he had a "positive view" of Plaintiff's effectiveness in his role. (A446,A498,A517). Irani-Famili found Plaintiff to be

23

"bright" and "capable." (A1410,A616,A635). On March 9, 2020, Irani-Famili told

Plaintiff that she thought he had a bright future at National Grid. (A1391,A56).

Defendant has never claimed that Plaintiff was incapable of performing the

basic functions, or that he lacked the minimum qualifications. Indeed, Defendant

claims that its main issue with Plaintiff was his failure to report to work in

Massachusetts, presumably because it assumed that he would perform the work

there capably. (A1464,A999-1000) ("We wanted him to come back").

Consequently, Plaintiff has established himself to be qualified, because he was

capable of the job and met the minimum requirements. Bulwer, 473 Mass. at 681

(plaintiff performed [his] job at an acceptable level").

While Defendant asserts that there were issues with Plaintiff's expense

reports, communication, and loss of a phone, Defendant denies that these issues

had anything to do with the decision to fire Plaintiff. (A1515,A1463-64,A1000-01)

(court recognized that Plaintiff's "conduct prior to the pandemic reportedly played

no role in Defendant's decision to terminate him"). Indeed, the phone, expense,

and communications issues emerged before the April 2, 2020 performance review,

which nevertheless represented an overall positive evaluation.

(A1416,A812,A1077,A1420-21,A814).[5] Nothing in these issues undermines the

---

[5] Defendants acknowledge that there was no dishonesty or wrongdoing revealed in
the expense issues. (A1414-15,A1032,A945). While Plaintiff was asked to repay

evidence that Plaintiff was qualified. (A1464,A816-17) (as of August 2020, when Plaintiff was fired, Defendant "wanted him to come back" to work).

Employees need not be perfect to gain the benefit of the anti-discrimination laws. Perez v. Thorntons, Inc., 731 F.3d 699, 700 (7th Cir. 2013) (Title VII). Thus, a jury could find Plaintiff to be qualified, or reasonably considered himself qualified, even despite the possibility of some deficiencies. Torrech-Hernandez v. GE, 519 F.3d 41, 48-49 (1st Cir. 2008).

iii. A jury could find that Plaintiff reasonably believed himself capable of performing the essential functions

Next, the definition of qualification includes consideration of whether the Plaintiff can perform the essential functions of the job. As will be shown below, the parties contest whether Plaintiff could satisfy the essential functions of the job by working remotely. However, **whether or not remote work is consistent with performance of the essential functions, that issue is not relevant to the issue of qualification**. This is because Plaintiff clearly informed Defendant that he was willing and able to return to work on-location, if his request for remote work was denied.

---

about $300 in expenses, Vice President Irani-Famili herself has had to pay back expenses she mistakenly charged to the company. (A1415,A646).

On July 30, 2020, Plaintiff wrote to Defendant stating that if his request to work remotely is not approved, "I will drive back to MA immediately." (A1434,A968,A1231). He was willing to come back. He was willing to satisfy the essential functions of the job **as defined by Defendant**. (Id.). Given Plaintiff's willingness to return back to Massachusetts and perform his work on-location, he is qualified and capable of performing his job, even if on-location work were an essential element of the job.

To be clear, Plaintiff's requested accommodation to work remotely assumes that onsite presence was not an essential function. That issue will be addressed below. But for the limited purposes of baseline qualification, Plaintiff has proven himself qualified even if onsite work is an essential function.

iv.    Plaintiff requested the reasonable accommodation of remote work

Plaintiff requested a reasonable accommodation. On July 22, 2020, Plaintiff requested reasonable accommodation in light of the request that he attend the Providence training. (A1425,A1054). On July 30, 2020, Plaintiff requested the "reasonable accommodation" of remote work, stating as justification, "I have a pre-existing health conditions that I believe puts me at a higher risk for COVID." (A1434,A968,A1231). Plaintiff further stated that if Defendant has changed its policies and is now requiring onsite work, "I would need reasonable accommodations due to COVID." (Id.).  On August 4, 2020, Plaintiff emailed

26

Judith Dunn, HR Manager, referring to his request for reasonable accommodation and reiterating his believe that he could do his job remotely. (A1442,A985,A1249).

On August 4, 2020, Plaintiff emailed Dunn again, acknowledging that she was rejecting his request pursuant to the remote work policy (which applied to everyone, and not just the handicapped), but further stating that that denial did not address his pending request for reasonable accommodation due to COVID-19 and his preexisting conditions. (A1443,A984-86,A1249). On that date, Dunn acknowledged Plaintiff's request for reasonable accommodation, and instructed him on how he could perfect his request through contacting Employee Health and providing medical documents. (A1443,A988-89,A1252).

On August 6, 2020, Plaintiff emailed Dunn, asking whether he was entitled to medical leave under the FMLA or the Families First Coronavirus Response Act (FFCRA), "as I need to work remotely for my own personal health reasons but also due to the health reasons impacting my elderly parents." (A1444,A990-91,A1256). A request for FMLA leave based on one's own medical condition can constitute a request for reasonable accommodation under c. 151B. Capps v. Mondelez Global, LLC, 847 F.3d 144, 156-157 (3d Cir. 2017); 29 CFR 825.702(c)(2). On August 6, 2020, Plaintiff began the process of formally requesting FMLA leave through Sedgwick Claims Management Services, Inc. Defendant's third party FMLA administrator. (A1446,A1033). Initially, Plaintiff sought FMLA leave to care for

27

his mother. (Id.). Plaintiff then expressed interest to Sedgwick in applying for leave for his own health conditions. (A1447,A1034).

Also on August 6, 2020, Plaintiff emailed Dunn to confirm that he had contacted the health department regarding his reasonable accommodation request. (A1403,A88).

As of August 11, 2020, in support of his request for reasonable accommodation, Plaintiff sent doctor's note supporting the request to Sarah Lavalle, a Nurse working with Defendant. (A1406,A88). The note certified the doctor's medical opinion that Plaintiff "would benefit from an accommodation to work remotely during the COVID pandemic," and invited Defendant to contact the doctor to request further information. (A1449, A1266,A1312-13,A1350,A1450,A1316,A1210). On August 11, 2020, Plaintiff emailed Dunn to update her on the fact that he had submitted materials to Lavelle in support of his reasonable accommodation request, and was waiting to hear back.  (A1406,A88). In a call of August 11, 2020 with Dunn, Plaintiff stated that he did not feel comfortable returning to the office, that he had a severe throat and lung condition, that he was a smoker, and that he had been advised by a doctor to work remotely. (Id.). Defendant deemed the note to be insufficient, asked Plaintiff to obtain further documentation from the doctor, and Plaintiff agreed to contact the doctor. (A1406,A88,A84,A1449,A1314-16,A1209-10).

28

Thus, Plaintiff clearly and repeatedly requested reasonable accommodation, and formally initiated the reasonable accommodation process by submitting a doctor's note to Defendant's Employee Health Department.  He specified his medical impairments, that he had a "severe throat and lung condition," in the context of his being a smoker, and identified how the reasonable accommodation related to addressing his claimed handicap -- "I have a pre-existing health conditions that I believe puts me at a higher risk for COVID." (A1406,A88,A1434,A968,A1231). All of this information was sufficient to place Defendant on notice of the requested reasonable accommodation, and how the requested accommodation related to his handicap. Moore, 2025 U.S. App. Lexis 11530, at 22-23.

> v.    Plaintiff reasonably and in good faith believed that the requested accommodation was consistent with the essential functions of his job

A reasonable accommodation is a workplace modification that allows an employee to perform the essential functions of the position. G.L. c. 151B, § 4(16). The evidence shows that Plaintiff reasonably, and in good faith, believed that the accommodation of remote work was consistent with the essential functions of his position. Moore, 2025 U.S. App. Lexis 11530, at 21-23.

Essential functions are fact-based and require individualized inquiry.  Smith v. Bell Atlantic, 63 Mass. App. 702, 712 (2005). While the employer's judgment is a factor, such evidence is not entitled to substantial weight. Cargill v. Harvard

29

Univ., 60 Mass. App. 585, 600 n.14 (2004) (deference to employer not required);

Tufts Medical Center v. Dalexis, 103 Mass. App. 386, 399-400 (2023) (Henry, J.,

concurring) (no substantial weight); Smith, 63 Mass. App. at 712 (employer

judgment is not a controlling factor and is tested against other benchmarks).

Factors to consider in determining if a function is essential includes the

number of other employees available to perform the function or among whom the

performance of the function can be distributed and the actual work experience of

others in the position. EEOC Notice, The ADA:  Your Responsibilities as an

Employer, § "How Are Essential Functions Determined?",

https://www.eeoc.gov/publications/ada-your-responsibilities-employer.

Many cases have held that remote work is a viable reasonable

accommodation, particularly in the COVID era. Peeples, 487 F. Supp. 3d at 63-64;

Lin, 2021 U.S. Dist. Lexis 179695 (D. Mass.), at 16. Indeed, given our ubiquitous

experience with COVID, and the success of remote work initiatives, any

presumption against the validity of remote work has been completely dispelled.[6]

Moreover, there were many other Change Analysts and others who could have

filled in, to the extent that the company wanted to continue having someone

---

[6] Kinney v. St. Mary's Health, Inc., 76 F.4th 635, 643-644 (7th Cir. 2023); Shu, D'Andra Millsap, Remote Work Disability Accommodations in the Post-Pandemic Workplace: The Need for Evidence-Driven Analysis (December 30, 2022). 95 Temple L. Rev. 201, 206-207, 233, 240 (2023), Available at SSRN: https://ssrn.com/abstract=4190092

perform the duties customarily performed by Plaintiff in onsite trainings. Melo v. Somerville, 953 F.3d 165, 170 (1st Cir. 2020); Samson v. Federal Exp. Corp., 746 F.3d 11196, 1202 (11th Cir. 2014).

As a Change Analyst, Plaintiff was responsible for planning technological change, and rolling out and supporting those changes within Defendant's natural gas business. (A1425,A1031). Plaintiff never led trainings. (A1426,A1031). When Plaintiff attended trainings, his role was merely to help individuals with their devices. (A1427,A1033).

There was significant evidence that Plaintiff could do his job remotely. Prior to COVID, Plaintiff generally worked remotely on Fridays and some trainings were conducted virtually. (A1419,A1032). Around the time of the COVID shutdown in March 2020, GBE office employees were told to work fully remotely, and they were even encouraged to travel out of state to check in on loved ones. (A1419,A1050). Plaintiff worked fully remotely from March to July 2020, without any request for him to work onsite. (A1419,A1032). Even as of late July 2020, when Defendant was asking Plaintiff to work onsite, it nevertheless assigned him productive work to perform remotely while he was in NY, and he worked that way through the date of his termination on August 18, 2020.  (A1405,A88,A585-86,A592-93,A1440-42).

31

Plaintiff's written job description did not specify any functions that had to be performed in-person. (A1431,A1225,A601-02). This is a substantial indication that onsite work is not an essential function. MCAD & Joseph v. Mass. Dept. of Children and Families, 2023 Mass. Comm. Discrim. Lexis 3, at 25 (driving is not an essential function where not specified in job description).

At least four other Change Analysts worked fully remotely for the duration of COVID. (A1419,A527-28,A578-80,A888-89,A891). At least eight other employees within GBE who reported to Irani-Famili were working fully remotely as of July 2020. (A1420,A1070). Defendant could have assigned Plaintiff a fully remote work stream, as it did with some of his colleagues.

The fact that other Change Analysts worked remotely shows that working onsite was not an essential function of the job – or, just as helpful to Plaintiff – shows that Plaintiff could have reasonably believed that working onsite was not an essential function. Labonte, 423 Mass. at 822. While some Change Analysts worked onsite, a number did not. (A1419,A527-28,A580,A578-79,A888-89,A891). This evidence establishes that onsite work was not an essential function. Dalexis, 103 Mass. App. at 396 (overtime not an essential function of a nurse where five percent of the nurses worked no overtime at all).

While Defendant was upset at Plaintiff for not attending a training in RI on July 28 and 29, the training was successfully held as scheduled, with the trainer

32

appearing virtually via the web, and another GBE employee was present to distribute iPads. (A1432,A1033,A803,A686-87,A956,A1228). Moreover, Plaintiff repeatedly communicated his belief that his role could be accomplished remotely. (A1400,A88,A1401). Thus, there is a genuine dispute of material fact as to whether onsite work was actually, or reasonably believed to be an essential function of the position of Change Analyst.

The court below generated gloss creating a heightened burden for establishing the twin burdens of reasonable accommodation and essential functions. It stated that, "the threshold for showing that one can perform essential job functions with or without accommodations is a rigorous one, requiring more than anecdotal evidence; rather, it necessitates a clear demonstration of capability despite the claimed disability." (A1516). In actuality, plaintiff's burden is to "prove by a preponderance of the evidence that he or she was able to perform the essential duties of the position with reasonable accommodation." Gannon v. Boston, 476 Mass. 786, 796 (2017).

There is no requirement to meet a "rigorous" standard or establish "clarity," beyond showing that plaintiff could more likely than not satisfy his burdens. Id. Moreover, anecdotal evidence is persuasive, over and above the employer's broad assertions, because what matters is the reality on the ground. Cargill, 60 Mass. App. 600 n.14 (deference to employer not required). However, even if there were a

heightened burden (there is not), what matters is that there is sufficient evidence to support Plaintiff's reasonable belief that his proposed reasonable accommodation would not interfere with the essential functions of the job.

All of this evidence, taken together, shows that Plaintiff has satisfied his initial prima facie burden of proving that he engaged in protected activity under c. 151B.

b.      Plaintiff Suffered an Adverse Action

The second element in the prima facie case, that Plaintiff suffered an adverse action, is undisputed, as he was terminated on August 19, 2020. (A1461,A1021-22,A1364).

c.      Plaintiff Has Satisfied His Burden of Supplying Minimal Evidence of Causation

The third element of the prima face case of retaliation under Chapter 151B requires the plaintiff to show some minimal evidence establishing some causal link between the protected conduct and termination. <u>Verdrager</u>, 474 Mass. at 406. This proffer is examined with the understanding that the prima facie case is not meant to be onerous. <u>Che v. MBTA</u>, 342 F.3d 31, 39 (1st Cir. 2003). As will be shown, Plaintiff has a strong prima facie case, as he has satisfied this burden in three independently sufficient ways.

  i.   Two Day Gap Between Request for Remote Work and Threat to
        Terminate

The timing of events is often an important part of a retaliation case. Pardo v.

General Hosp. Corp., 446 Mass. 1, 19-20 (2006). As a general matter, the smaller

the shorter the temporal gap, the easier it is to infer a causal relationship. Id. A

short gap will satisfy the "causation" burden of the prima facie case. Psy-Ed Corp.,

459 Mass. at 707; DeCaire v. Mukasey, 530 F.3d 1, 19 (1st Cir. 2008)

("[T]emporal proximity alone can suffice to 'meet the relatively light burden of

establishing a prima facie case of retaliation.'" ).

A gap of two months is sufficient to satisfy the prima facie case. King v.

Boston, 71 Mass. App. 460, 475 (2008) (inference of retaliation permissible where

employer removed access to lockers within two months of receiving grievance

about bias in locker room access); Mariani-Colon v. Dept. of Homeland Sec., 511

F.3d 216, 224 (1st Cir. 2007).

In this case, there was a two-day gap between Plaintiff's first request to

work remotely and Defendant's threat to separate him from employment. Such

timing indicates that Defendant's desire to remove Plaintiff from its workforce was

a reaction to his request for remote work.

In late July 2020, Plaintiff was informed by Defendant's Employee Health

department that he could request permission to work remotely, out-of-state, based

on a remote work policy available to eligible employees without regard to

35

disability. (A1427-1428,A1086-1093) On July 28, 2020, Plaintiff emailed Dombroski, requesting leave to work remotely pursuant to that policy. (A1427-1428,A1086-1093,A976). This was plaintiff's first request to work remotely, but it was made in the context of a general request for reasonable accommodation, lodged six days before. (A1424,A1025). Two days after the July 28 request for remote work, on July 30, 2020, Defendant emailed Plaintiff, demanding that he return to work on site in Massachusetts <u>that same day</u>, or else be deemed to have resigned. (A1432-1434,A956, A1231,A967). As an alternative, Defendant offered nine weeks of severance in returned for a release of claims. (<u>Id</u>.). Defendant's immediate response to the request of remote work was overtly hostile and went straight to final separation.

While this request for remote work did not invoke the term "reasonable accommodation," Defendant's immediate and incredibly hostile reaction to the request is significant, because Plaintiff's later request for reasonable accommodation also sought remote work. Therefore, Defendant's threat to end Plaintiff's employment two days after he first sought remote work, helps to prove Defendant's retaliatory mindset with respect to Plaintiff's later request for reasonable accommodation seeking the same thing.

36

ii. Three-week gap between request for reasonable accommodation and termination

Plaintiff first requested the reasonable accommodation of temporary remote work on July 30, 2020. (A1434-35,A968,A1231-33). Plaintiff was terminated three weeks later, on August 19, 2020. (A1461,A1021-23,A1364-65). The three-week gap between the protected request and termination likewise, and independently satisfies the prima facie case. Mariani-Colon, 511 F.3d at 224.

iii. Combination of Satisfactory Work Performance With Continued Need for Plaintiff's Work

Plaintiff also satisfies his prima facie case in a third way. As shown above, Plaintiff was qualified in that he had a record of satisfactorily performing his work, a good review, good relationships, and a positive assessment by management. Supra § I(B)(1)(a)(ii). Moreover, the Defendant had a continuing need for the work that Plaintiff was performing.  (A1464,A999-1000). ("We wanted him to come back").[7]

The combination of these two showings generates an inference of unlawful discrimination, because it tends to establish that the termination did not result from

---

[7]  Velazquez-Fernandez v. NCE Foods, Inc., 476 F.3d 6, 11 (1st Cir. 2007) ("the employer had a continuing need for the services provided previously by the plaintiff"); Rodriguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 59 (1st Cir. 2005) ("We have held several times that a plaintiff need not demonstrate that a new employee was hired or a current employee was formally designated as a replacement in order to satisfy the fourth prong of the prima facie case").

37

the two most common reasons for such action – lack of qualification and lack of a need for Plaintiff's services. International Bhd. Of Teamsters v. U.S., 431 U.S. 324, 358 n.44 (1997) ("Elimination of these reasons . . . is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one").

Thus, Plaintiff has established a strong prima facie case, in that he squarely met the burden in three, independently sufficient ways.

2.    Defendant's Articulated Reasons

In response to Plaintiff's prima facie case, Defendant was required to articulate a legitimate, nondiscriminatory reasons for firing Plaintiff. Verdrager, 474 Mass. at 406. Defendant explained that the "only" reason for terminating Plaintiff was his failure to "return to the franchise for his stated job." (A1464,A999-1000). According to Defendant, one of the duties that Plaintiff was allegedly neglecting was his "storm duties." (A1249-1250).

Defendant also acknowledged that if Plaintiff had timely provided additional medical evidence in support of his request for reasonable accommodation by August 18, 2020, he would not have been fired on August 19. (A1465,A1014,A709).

3.    Plaintiff Can Satisfy the Third Stage of the Burden-Shifting Rubric

There are two ways of satisfying the third stage of the *McDonnell Douglas* framework. The plaintiff may establish a violation by [1] affirmatively

38

demonstrating that one of the employer's reasons was retaliation, or [2] in a negative fashion, by proving that one or more reasons offered by the employer was not an actual reason that motivated the employer at the time.[8]

With respect to the first path, affirmative evidence of an unlawful motive includes timing evidence, biased remarks, or otherwise negative treatment of or hostility towards the plaintiff's protected trait. Patterson v. McLean Credit Union, 491 U.S. 164, 187-188 (1989), superseded by statute on other grounds.

Such affirmative evidence need not satisfy the evidentiary threshold for so-called "direct evidence."[9] Where there is sufficient affirmative evidence to show that one of the employer's reasons is discriminatory, the plaintiff need not also disprove the employer's articulated reasons, because "a violation . . . may still

---

[8] Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981) (The third *McDonnell Douglas* stage can be satisfied "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."); Chief Justice for Admin. & Mgmt. of the Trial Court v. MCAD, 439 Mass. 729, 735 (2003) ("There was no need for the [finder of fact] explicitly to reject the nondiscriminatory reasons ultimately proffered by the [employer] because a violation of G.L. c. 151B may still occur even if those reasons played some part in [the adverse action]").

[9] Lipchitz , 434 Mass. at 502 n.14; Holtz v. Rockefeller & Co., 258 F.3d 62, 81 (2d Cir. 2001) ("As noted, the plaintiff may instead rely on evidence -- circumstantial or otherwise -- showing that an impermissible reason was a motivating factor, without proving that the employer's proffered explanation" played no role in its conduct").

occur even if [the employer's nondiscriminatory reasons] played some part in [the] decision."[10]

With respect to the second path, an employer's "pretextual explanation naturally gives rise to an inference of discriminatory intent." Snyder v. Louisiana, 552 U.S. 472, 484-485 (2008). The Plaintiff is not required to disprove every reason articulated by the defendant. The Plaintiff can "meet her burden by persuading the fact finder that it was more likely than not that at least one reason was false." Lipchitz, 434 Mass. at 507; see Joseph v. Lincare, Inc., 989 F.3d 147, 161 (1st Cir. 2021). Proving a single reason to be pretextual is sufficient, as the but-for standard establishes that an adverse action may be unlawful "even when nondiscriminatory reasons play some role in [an adverse action]." Chief Justice, 439 Mass. at 735. As will be shown, Plaintiff has plenty of evidence to satisfy either way of satisfying her burden.

---

[10] Chief Justice, 439 Mass. at 735; see also Stroup v. United Airlines, Inc., 26 F.4th 1147, 1160 (10th Cir. 2022) (the plaintiff is "not required to show that the reasons offered were false, but that they were not the only reasons and that [discrimination] made a difference"); Bart v. Golub Corp., 96 F. 4th 566, 570 (2d Cir. 2024) ("a Title VII plaintiff can prevail by proving that an impermissible factor was a motivating factor, without proving that the employer's proffered explanation was not some part of the employer's motivation"); Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1021 (8th Cir. 2005) (plaintiff need only "adduce enough admissible evidence to raise a genuine doubt as to the legitimacy of the defendant's motive, even if that evidence [does] not directly contradict or disprove [the] defendant's articulated reasons for its actions.").

a.   Plaintiff Has Ample Affirmative Evidence to Show that One of the Reasons for Plaintiff's Termination Was Retaliation

i.   Plaintiff's Request for Reasonable Accommodation Was Discussed at the Termination Meeting

The decision to terminate Plaintiff was made at a meeting in which the two decisionmakers, Dunn and Irani-Famili, actively discussed Plaintiff's request for reasonable accommodation. (A1462,A717,A997-998,A1015-1016,A715). The discussion of a plaintiff's protected act at a meeting to decide whether to terminate him or her, raises the inference that the protected act was a cause for the decision to fire that plaintiff. Kinzer, 99 F.4th at 120 (claim of retaliation supported by the fact that, "Bonin admitted the executives discussed a legal action by Kinzer while deliberating her fate").

ii.   Defendant's Hostility Toward Plaintiff's First Request for Remote Work

Defendant immediately sought to separate Plaintiff from employment upon his initial request to work remotely. From July 13 to July 27, 2020, Plaintiff took a two-week vacation that his manager Dombrowski had pre-approved. (A1395,A124 A125,A1422,A867-868). Dombroski was aware that Plaintiff was traveling out-of-state. (A1397,A99,A1422,A868). Dombroski was interested in having Plaintiff attend an in-person training in Rhode Island on July 28 and 29. (A1423,A871). There had been no prior communications between Plaintiff and Dombroski regarding his attendance at the training, and Defendant was aware that Plaintiff

41

was not scheduled to attend the training.  (A1423,A873-875,A1033,A1424,A1051).

On July 22, 2020, Dombroski contacted Plaintiff and asked him, "would you be able to go to R[hode] I[sland]?"  (A1423,A870-72). This request was not framed as an order, as Plaintiff did not have responsibility to lead the training. (A1423-24,A873,A1051,A1033). Plaintiff replied that he was not comfortable doing the in-person training and inquired whether he would need to quarantine, anyway, which would prevent him from going to the training. (A139,A873-877,A1424-25,A805-806,A1043). When pressed to attend, Plaintiff also mentioned the idea of requesting reasonable accommodation. (A1425,A1054).

Plaintiff contacted Defendant's Employee Health department, and he was informed that upon returning to Rhode Island or Massachusetts, he would need to self-quarantine for 14 days. (A1427-28,A1086-93). The Employee Health department also informed Plaintiff that as an office employee, he was not required to work on-site due to COVID concerns. (Id.). Finally, Plaintiff was told that employees would be permitted to work remotely out-of-state with manager approval, pursuant to a policy separate from the Reasonable Accommodation policy. (Id.).

On July 28, 2020, Plaintiff emailed Dombrowski to inform her of these instructions, and requested permission to work remotely. (A1427-1428,A1086-

1093,A1430,A806). Based on the email, Dunn knew that Plaintiff would have to quarantine for 14 days upon return to Massachusetts, and that he was categorically precluded from attending the training in RI. (A1427-28,A1086-93,A1430,A857).

On July 30, 2020, Defendant emailed Plaintiff, claiming that he had violated the terms and conditions of his employment by not timely returning to the service territory to perform his work at the RI training. (A1432-33,A956,A1231). Defendant irrationally complained that it had been forced to have a different employee attend the training in Plaintiff's place, even though Plaintiff had never been scheduled for the training and that the quarantine would have prevented him from attending anyway. (Id.) The email concluded that "your refusal to report to work in Massachusetts, your place of employment, in defiance of managerial instructions, will be deemed a resignation effective July 30, 2020." (Id.) The email then irrationally demanded that the plaintiff return to Massachusetts that day, or else be deemed to have resigned that day.  (A1431-34,A956,A967).  As an alternative, Defendant proposed that Plaintiff accept a severance of nine weeks salary, in return for a signed release and waiver of claims. (A1431-33,A956).

Plaintiff immediately wrote back, stating that his conduct was explained by his compliance with instructions given to the GBE team to work remotely due to COVID, and that under no circumstances could he have attended the RI training, due to a mandatory quarantine of 14 days upon his return from vacation. (A1434-

43

35,A968,A1231-32).  He noted that he did not neglect his duties due to a lack any requirement to be onsite. (Id.) He further noted that his presence at the training was never presented as a requirement, and that his manager asked him to attend as it would be "nice to have" him there. (Id.)

Dunn wrote back on July 30, again accusing Plaintiff of "infringement" of his obligations, and complaining that "other staff employees had to step in and perform your assigned work duties, which is unacceptable." (A1435-36,A970,A1231).  Again, Dunn does not explain why Defendant is holding Plaintiff responsible for the engagement of other staff members at the RI training, when due to a mandatory quarantine, there was no way that Plaintiff could have attended that function. Id. Likewise, Dunn claimed that there was no directive to work remotely, when Plaintiff had been informed by Employee Health that there was one, just a few days prior. (A1435-36,A970,A1231,A1427-28,A1086-93).

Instead of squarely addressing Plaintiff's request for accommodation and identifying the proper process, Dunn dismissively invalidated the request as "non-existent," because he did not ask for it before he left on vacation. (A1436,A970-71). Dunn's response violated Defendant's reasonable accommodation policy, which did not contain any such timing requirement for requests, but does require a written statement if a request is denied. (A1439,A1174,A1239,A1171).

44

Consequently, Defendant's immediate reaction to Plaintiff's requests for remote work was to invent a "resignation;" claim his requests were non-existent in violation of company policy; fail to timely advise him of how to perfect his requests for accommodation; to knowingly criticize him for matters beyond his control (the quarantine and the instruction to GBE employees); and express hostility toward the request itself. Clearly, this overwhelming animus was directed at Plaintiff's request for remote work.

    iii.    Defendant Terminated Plaintiff, Knowing that He Was Willing to Return to Work If His Request for Reasonable Accommodation Was Denied

In response to the July 30, 2020 threat to terminate Plaintiff (i.e., to assume his resignation), Plaintiff wrote back the same day, stating that it was not his intention to resign. (A1434-35,A968,A1231-32). With respect to his request for remote work, Plaintiff wrote, "If that request has not been approved, I will drive back to work immediately." (Id.) At this point, Plaintiff requested reasonable accommodation to work remotely, because of his "pre-existing health conditions that I believe puts me at a higher risk for COVID." (Id.) Thus, Plaintiff made it clear that he was seeking remote work as a reasonable accommodation, but if that request was denied, he would "drive back to work immediately." (Id.)

On August 12, while his request for reasonable accommodation was still pending, Defendant requested further medical documentation, in addition to the

doctor's note that he had already provided. (A1451-1452,A1323-1324,A1352-1353). The letter asked Plaintiff to "[p]lease" submit the additional medical documentation in six days, by August 18, 2020.  (Id.)  The letter contained no hint of any consequences for being late. (Id.) There was no indication that Plaintiff would be terminated if additional documentation was not submitted by August 18, and indeed, Lavalle, who wrote the letter, did not have that understanding. (A1453-54,A1324-25).  Plaintiff was not otherwise warned that he would be terminated if he missed the deadline to provide medical documentation. (A1456-57,A1010,A1034).

Plaintiff worked diligently to have his doctor provide the additional information requested by Defendant, but the office was busy. (A1456,A1010). Plaintiff also asked Defendant to follow up with his doctor directly. (Id.) Defendant did not follow up the invitation to contact the doctor. (Id.) Eight business minutes after the deadline to supply the documentation, Defendant terminated Plaintiff. (A1461,A1021-1023). It did so **without denying Plaintiff's request for reasonable accommodation, and without giving him a chance to return in light of that denial**.

The result was to steamroll Plaintiff out of his job, over an issue intimately connected with his request for reasonable accommodation. Indeed, Defendant admitted that if Plaintiff had provided the additional documentation on time, it

46

would not have fired Plaintiff.  (A1465,A1014,A709). Plaintiff stated that he would come back immediately if his request was denied, but Defendant did not give him the opportunity to do so, despite its repeated pronouncements that it wanted him to come back. (A1464,A999-1000,A1364-1365).  This evidences blatantly retaliatory conduct.

> iv.     Disparate Treatment in the Way Plaintiff was Terminated Without Warning

The violation of general practices helps to establish pretext.  Harrington, 668 F.3d at 33; Brennan v. GTE Gov't Sys. Corp., 150 F.3d 21, 29 (1st Cir. 1998). Lavelle, the Defendant's Nurse, testified that she was not aware of any other employee being terminated in connection with missing a deadline for submitting documentation in support of a request for reasonable accommodation. (A1454,A1325), Tess Overdyk, Health and Well Being Manager, testified that, "Our goal is to be flexible and not rigid" in giving employees time to provide medical documentation. (A1454,A1157).  Indeed, Defendant's Reasonable Accommodation policy does not establish a hard deadline for submitting documentation, at all. (A1455,A1155,A1239-1247).

The evidence indicates that Defendant was laying a trap. Before the deadline for submitting documents had elapsed, Dunn had repeatedly communicated to others, including Irani-Famili, an intent to fire Plaintiff immediately "at 8:00 am" the next day, if Plaintiff failed to provide the medical records. (A1459,A1017-

47

1018,A1359-1360,A1460,A1019-1020,A1362).  Plaintiff was never warned of these dire consequences. (A1456,A1010).  The disparity between the treatment of Plaintiff and the otherwise flexible attitude towards provision of documentation indicates an abundance of animus aimed directly at Plaintiff's request for reasonable accommodation.

Moreover, Defendant's general practice was to initially give employees seven days to provide documentation, as opposed to the six it gave Plaintiff. (A1455,A1203).  Defendants provide no explanation as to why an accelerated deadline was used for Plaintiff. (A1455,A1008).  This disparity likewise shows the effort to induce the failure that led to the termination.

v.        Hostility Toward Plaintiff's Request for FMLA Leave

It is well established that FMLA leave can be a form of reasonable accommodation. Capps, 847 F.3d at 156-157. Therefore, hostility towards an FMLA request is potent evidence of animus against a request for reasonable accommodation.

On August 6, 2020, Plaintiff emailed Dunn, asking whether he was entitled to medical leave under the FMLA or the Families First Coronavirus Response Act (FFCRA), "as I need to work remotely for my own personal health reasons . . .." (A1444,A990-991,A1256-1259).  Instead of responding to his question about entitlement to leave, and identifying the process for initiating an FMLA request,

48

Dunn stated that Defendant had "no record of you identifying a pre-existing condition that would prohibit you from performing your work duties," and asked Plaintiff to consider the pending severance offer. (A1445,A991,A1256-1259).

The exchange of August 6 demonstrates how Defendant was much more interested in pushing separation from employment rather than seriously engaging with Plaintiff on his requests for reasonable accommodation. Defendant acknowledges that the failure to communicate the process involved in FMLA requests was "probably … an oversight," but a jury could see this breach as more evidence of hostility towards Plaintiff's efforts to obtain reasonable accommodation. O'Brien v. MIT, 82 Mass. App. 905 (2012) (employer's resistance to requests for leave under FMLA and reasonable accommodation precludes summary judgment). Moreover, the fact that Plaintiff did not identify a disability in 2017 does not invalidate the legitimacy of an FMLA leave in the COVID era of 2020.

    b.    <u>Plaintiff has Proved that One or More of Defendant's Articulated Reasons Are Pretext</u>

Plaintiff's affirmative evidence of hostility toward his requested accommodation for remote work is, by itself, sufficient to satisfy his case under the burden shifting framework. However, even if it were not enough (it is), plaintiff also has sufficient evidence to demonstrate that at least one of Defendant's reasons for termination was pretextual. <u>Lipchitz</u>, 434 Mass. at 507.

      i.       Defendant has Changed Its Story, Having Told the MCAD
              Completely Different Reasons for Discharge

Defendant's testimony about the reasons for termination are different from, and inconsistent with the assertions it made to the Massachusetts Commission Against Discrimination. Where a decisionmaker's testimony about the reasons for the adverse action contradict the employer's statements to the MCAD, this evidence "is sufficient to meet [the plaintiff's] burden at the third stage." Scarlett v. Boston, 93 Mass. App. 593, 600-601 (2018).

In its disclosures to the MCAD, Defendant identified many reasons for Plaintiff's discharge, including his "difficult and combative attitude," his violation of "expense policies," his absence at "an important meeting on November 18, 2019," and his failure "to report the loss of his company-issued cell phone to his manager." (A1486-1487,A723-725).

However, these assertions were directly contradicted by Dunn, a decisionmaker, who testified that the only reason for terminating Plaintiff was his failure to "return to his position, which was in the franchise area." (A1464,A999-A1000,A1462,A717).  When asked if there was any other reason for terminating Plaintiff, Dunn responded, under oath, "No. We wanted him to come back." (A1464,A999-A1000).  **Moreover, Dunn flatly denied that expenses, attitude or the cell phone played any role in the decision to terminate Plaintiff**. (A1463,A1000-1001,A1464,A1001).  Dunn elsewhere testified:

50

Q.    But, again, those expense issues and cell phone issues didn't play a part in the decision to terminate him. Correct?

Objection.

A.    They did not. We just wanted him to come back.

(A1470-1471,1025). The changing, contradictory reasons given for termination establishes as pretextual at least four of Defendant's reasons, including the attitude, expenses, missed meeting and cell phone. Scarlett, 93 Mass. App. at 600-601. Again, only one pretext is needed to prevail.

ii.    Plaintiff Was Not Responsible for Storm Duties

On August 4, 2020, Dunn emailed Plaintiff, rejecting his request pursuant to the management protocol for permitting remote work, by stating, "The expectation is that you are in Massachusetts, to be on-site as needed, per your job and storm duty requirements." (A1443,A984-986,A1249-1250).  Dunn's statement about storm duties, which requires certain employees to work during certain storms, was false. (A1443,A1184).  Neither Plaintiff, nor any other GBE workers, were responsible to come in for storm duties. (A1443,A984-986,A1249-1250). Therefore, storm duties cannot possibly justify withholding permission for remote work.

4.    Plaintiff Has Established a Strong Case Under the Burden-Shifting Framework

Plaintiff's case is very strong. He has established a solid prima facie case in three, independently sufficient ways. He has offered five categories of evidence affirmatively showing that hostility towards his request for remote work as a reasonable accommodation was at least one of the reasons for his discharge. He has also offered substantial evidence that five of the Defendant's explanations for his conduct were pretextual (when only one would be sufficient). Under these circumstances, Plaintiff is entitled to present his case to a jury. Lipchitz, 434 Mass. at 502 & n.14; Verdrager, 474 Mass. at 406.

5.    The District Court Analyzed the Case Improperly

Above, we have discussed how the district court failed to properly apply the but-for standard, and improperly imposed an overly rigorous test for establishing reasonable accommodation. However, there are other ways in which the district court erroneously analyzed the case.

The district court held that animus for Plaintiff's request for reasonable accommodation could not have possibly played a role, as the issues of July and August 2020 were somehow a continuation of a history of problems that pre-existed the controversy over remote work. Those problems included a lost phone, failure to show up at a scheduled event, and discrepancies in Plaintiff's expense reports. (A1521-22).  The district court analogized Plaintiff's situation to cases in

52

which an employee's supervisor recommended termination before the employee engaged in protected activity, such that it is unfair to assign blame for the termination to the protected activity. (A1521) ("The present case closely follows *Pearson*), citing Pearson v. MBTA, 723 F.3d 36, 42 (1st Cir. 2013).

However, this case is completely different than Pearson. First, a decisionmaker testified that the issues involving the phone, missed event, and expenses played absolutely no role in the decision to fire Plaintiff. (A1463-A1466,A1000-A1001,A722; see A1414-A1415,A782-783,A945) (Defendant found no dishonesty or wrongdoing found in connection with Plaintiff's expense reports); (A1464,A999-1000) (the only reason for discharge related to Plaintiff's failure to return to the franchise area).

Second, the district court acknowledged that Plaintiff's "conduct prior to the pandemic reportedly played no role in [Defendant's] decision to terminate him . . .." (A1522).  It is hard to understand how the court could accept that these earlier incidents played no role, and yet, also represent dispositive momentum towards termination.

Third, given that all of the pre-pandemic incidents occurred prior to Plaintiff's **positive** annual evaluation, they are consistent with the record of a capable, valued employee regarded as having a "bright future" with the company, and do not represent an inevitable slide into justified termination.

53

(A1391,A56,A1416,A812,A1077-A1080,A1420-A1421,A814,A1077-A1080).  As of August 6, 2020, Defendant testified that there were no plans to terminate Plaintiff. SOF (A1445-A1446,A992,A994). The court's holding is completely at odds with bedrock, Rule 56 principles to consider facts in a light favorable to the plaintiff.

Fourth, if the district court was relying on the threat to terminate Plaintiff on July 30 (A1428-1430,A569-570,A578,A808-809,A960,A976,A1179), that threat was directly made in retaliation to Plaintiff's request for remote work. In other words, the threat was initiated by Plaintiff's request for remote work, which would later constitute the heart of his request for reasonable accommodation. The warning was caused by the effort to obtain remote work – it did not precede it.

The district court characterized Plaintiff's performance evaluation as "negative," while Dombrowski, who issued the evaluation, characterized it as a "good review." (A1522, A1420, A814).

The district court found that there were "policy requirements" that demanded Plaintiff's onsite presence. (A1522). This was an inappropriate finding of a contested fact, given that there was absolutely no written policy certifying that Change Analysts had to work onsite, and there were multiple examples of Change Analysts that performed exclusively remote work. (A1431,A601-602,A1225-1226).  In fact, a substantial number of GBE employees, including other Change

54

Analysts, were currently working fully remotely. (A1419-1420,A1032,A580-582,A888-890).  Moreover, the court's finding is inconsistent with the fact that Plaintiff was told by the Health Department that office workers such as himself were to be fully remote as of March 2020 and beyond. (A1419,A1050,A1427-28,A1086-93).  ("The [Employee Health] representative was sure to inform me that as an office employee I am not required to be on-site at [Defendant's] facilities due to COVID-19 concerns"). The court violated Rule 56 standards when it found the existence of a policy requiring onsite work. Kinzer, 99 F.4th at 107.

The district court based its decision on the fact that Plaintiff "did not complete the [reasonable accommodation] process" and did not heed Defendant's "warning." (A1522).  However, the decision does not grapple with the fact that Plaintiff was never warned that he would be terminated if he did not provide the medical documentation on time (A1456-A1457,A1010,A1034), and that no one else was terminated for being late with such documentation (A1454,A1325).

While Overdyk testified that it was company policy to be "flexible" with the deadline for providing reasonable accommodation documents (A1454,A1157), the Court finds no hint of bias when Plaintiff was fired for being eight business minutes late with his materials. (A1461,A1021-1023,A1364-1365). Moreover, the court does not address the obvious alternatives Defendant had available when Plaintiff was late. For example, it could have denied Plaintiff's request for

55

reasonable accommodation, whereupon Plaintiff had promised to "drive back to MA immediately." (A1434-1435,A968,A1231-1233).  Indeed, Plaintiff never overtly refused to return; he only, consistently with Defendant's policies, stayed away pending his reasonable accommodation requests, while also effectively engaging in remote work during that time. (A1465,A1034,A585).  For these many reasons, the district court's decision on Count III should be reversed.

III.    PLAINTIFF HAS INTRODUCED SUFFICIENT EVIDENCE TO SUPPORT HIS FMLA CLAIM

The district court improperly dismissed Count IV – Plaintiff's claim of retaliation under the FMLA. This claim is largely duplicative of the c. 151B retaliation claim discussed above, and should be reinstated for largely the same reasons. The burden-shifting framework applies to FMLA retaliation. Hodgens v. General Dynamics Corp., 144 F.3d 151, 160-161 (1st Cir. 1998),

The FMLA permits employees to take up to 12 weeks of leave per year due to a serious medical conditions, or to care for a family member with a serious medical condition. 29 U.S.C. § 2612(a)(1)(C)&(D). An employee making reasonable inquiries about FMLA leave cannot be fired for doing so, even if it is later determined that the employee would not have been entitled to it. Milman v. Fieger & Fieger, P.C., 58 F.4th 860, 869-870 (6th Cir. 2023); 29 U.S.C. §§ 2615(a)(1)&(2). Moreover, even if the employee makes no request for leave, it is unlawful to fire someone because the employer deems him or her to be at risk of

56

making such a request. Duckworth v. Pratt & Whitney, Inc., 152 F.3d 1, 10-11 (1st Cir. 1998).

Defendant was aware that Plaintiff was inclined to apply for FMLA leave based on his medical condition. On August 6, 2020, Plaintiff applied for FMLA leave so that he could take care of his mother. (A1402-1403,A323-343). Later that day, on August 6, 2020, Plaintiff emailed Dunn, asking whether he was entitled to FMLA leave, "as I need to work remotely for my own personal health reasons but also due to the health reasons impacting my elderly parents." (A1444,A990-991,A1256-1259).  On August 7, Defendant's FMLA administrator called Plaintiff, who expressed interest in applying for leave for his own health conditions. (A1403-1404,A1447,A1033-1034).  The representative recorded that Plaintiff was withdrawing his claim to care for his mother. (Id).

On August 12, 2020, Plaintiff sent an email to Dunn referencing his ongoing efforts to apply for FMLA leave. (A1450,A1002,A1261).  On August 12, 2020, Defendant sent a letter to Plaintiff acknowledging its understanding that he requested FMLA leave, and identifying the steps he would need to perfect that request. (A1451-52,A1323-24,A1352-53).

On August 18, 2020, the day of the deadline for providing supplemental medical documentation supporting the request for reasonable accommodation, Dunn asked Overdyk about whether the FMLA administrator had received any

57

information from Plaintiff. (A1458,A1016).  Overdyk responded that Plaintiff had provided nothing yet, and further reported that the administrator was on "high alert regarding this case." (A1458,A1016,A1357).  Thus, Defendant was aware that Plaintiff posed the risk of requesting FMLA leave, because he stated that was his intent, and Defendant was carefully monitoring for updates. The district court acknowledged that Plaintiff's FMLA inquiries and statements amounted to protected conduct under the FMLA retaliation provision. (A1524).

At this point, all of the evidence described above, including the prima facie evidence, the affirmative evidence of animus, and the disproof of Defendant's reasons, support Plaintiff's claim of FMLA retaliation. Indeed, Plaintiff expressed an intent to apply for FMLA leave based on his medical situation only two weeks before his termination. (A1444,A990-991,A1256-1259).

The district court found that Plaintiff's claim failed due to lack of proof of causation, as "it is implausible that Dunn and Irani-Famili would terminate him due to an FMLA claim that had yet to be filed." (A1524).  But if it is plausible that an employer would fire an employee due to a filed claim, why does it become implausible that an employer would so retaliate against someone it believes is about to file?

Defendant's agents were on "high alert" regarding Plaintiff's FMLA plans, and were frantically emailing about FMLA requests on the eve of his termination.

58

(A1458-1460,A1357,A1016-1018,A1359-1360,A1019-1020,A1362).  They were poised on a hair trigger and focused on Plaintiff's intended FMLA request and request for reasonable accommodation, and they were dedicated to ending his employment before he would file.

Plaintiff has established animus, and all of Defendant's articulated reasons have been successfully contradicted as pretextual. He was fired without warning when he missed an otherwise benign-sounding deadline. Therefore, summary judgment was erroneously entered on Count IV.

## CONCLUSION

Plaintiff Sandy Harris, Jr. requests that the district court's order granting summary judgment be reversed with respect to Counts III and IV, and that the case be remanded for trial.

## REQUEST FOR ATTORNEYS' FEES

Plaintiff requests that he be provided an award of reasonable attorneys' fees and costs for work on this appeal, should he be adjudged the prevailing party after trial, pursuant to G.L. c. 151B, §9 and 29 U.S.C. §2617(a)(3).

Respectfully submitted,

*Plaintiff-Appellant Sandy Harris,*

By His Attorneys,


/s/Alan Crede                              .
Alan Crede (1st Cir. Bar #1195128)
THE LAW OFFICE OF ALAN H. CREDE P.C.
185 Devonshire Street, Suite 302
Boston, MA 021160
(617) 648-8263
alan.crede@credelaw.com



/s/Robert S. Mantell                       .
Robert S. Mantell (1st Cir. Bar#31754)
LAW OFFICE OF ROBERT S. MANTELL
47 Liberty Ave.
Somerville, MA 02144
(617)470-1033
RMantell@TheEmploymentLawyers.com


July 16, 2025

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I hereby certify that this brief complies with the type-volume limitations in Federal Rule of Appellate Procedure 32(a)(7), because it contains 12,906 words, including all citations and footnotes, but excluding the Cover Page, Table of Contents, Table of Authorities, Statement Regarding Oral Argument, Addendum, Certificate of Counsel, Signature Block and Certificate of Service and has been prepared in a proportionally spaced typeface in 14 point Times New Roman font.

/s/Alan Crede_____

Dated: July 16, 2025

61

## CERTIFICATE OF SERVICE

I, Alan H. Crede, counsel for Plaintiff-Appellant, hereby certify that this document has been filed through the Electronic Case Filing System and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to any of those indicated as non-registered participants on this date.

/s/Alan Crede_____

Dated: July 16, 2025

# ADDENDUM

<u>TABLE OF CONTENTS – ADDENDUM</u>

*Page*

Memorandum and Order, Hon. Angel Kelley, U.S.D.J. (Mar. 26, 2025) ............. Add.1

Clerk's Judgment (Mar. 26, 2025) ....................................................................... Add.25

i

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SANDY HARRIS, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Civil Action No. 1:22-CV-11628-AK |
| v. | ) | |
| | ) | |
| NATIONAL GRID USA SERVICE | ) | |
| COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM AND ORDER ON DEFENDANT NATIONAL GRID USA
SERVICE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

**ANGEL KELLEY, D.J.**

This matter is before the Court on Defendant National Grid USA Service Company, Inc.'s ("National Grid") Motion for Summary Judgment. [Dkt. 47]. On July 1, 2022, Plaintiff Sandy Harris, Jr. ("Harris") initiated this civil action against his former employer, National Grid, in state court. Harris alleges National Grid engaged in unlawful employment practices when he was terminated in August 2020. Specifically, Harris brings claims of disability discrimination (Count I), race discrimination (Count II), retaliation under Massachusetts law (Count III), retaliation in violation of the Family and Medical Leave Act ("FMLA") (Count IV), and interference with protected rights under the FMLA (Count V). [Dkt. 1-2]. On September 27, 2022, National Grid removed the case to federal court. National Grid has moved for summary judgment on all counts, arguing each of Harris' claims is legally deficient. For the following reasons, National Grid's Motion for Summary Judgment is **GRANTED**.

1

Add.1

## I.    BACKGROUND

The following facts are drawn from the full summary judgment record and are viewed in the light most favorable to the nonmovant, Harris, drawing all justifiable inferences in his favor but ignoring conclusory allegations, improbable inferences, or unsupported speculation. See Quintana-Dieppa v. Dep't of Army, No. 22-1858, 2025 WL 602351, at *3 (1st Cir. Feb. 25, 2025).

### A.    Factual Background

National Grid is an electricity and natural gas company that services more than 20 million customers throughout Massachusetts, Rhode Island, and New York. Harris, a Black man, joined National Grid as a Change Management Analyst within its Gas Business Enablement ("GBE") program in December 2017. The GBE program is responsible for implementing new systems of technology to replace outdated software and hardware. As a Change Management Analyst, Harris was a subject matter expert for his workstream of the GBE program, "training others in new software systems that National Grid was adopting," assisting with their launch, and providing follow-up support. [Dkt. 1-2 ¶¶ 6-11]. Harris frequently traveled for work with travel expenses paid by the company.

Initially, Harris reported to Melanie Smith, the Director of Change Management, until a reorganization in August 2019, when Jesse Harvey began sharing that role with Smith. Harvey reported to Reihaneh Irani-Famili, National Grid's Vice President of Business Readiness for Transformation. Harvey hired Trina Dombroski, a former National Grid employee with over 20 years' experience in various roles within National Grid, in September 2019 to be a manager within the GBE program. In October 2019, Harris began reporting to Dombroski directly rather than to either Harvey or Smith at the director-level.

2

Add.2

### 1.    Pre-Pandemic Performance Issues

During Harris' employment, National Grid addressed several issues with him, including the need for compliance with company policy, accurate communication regarding time off, and proper documentation of expense reimbursements. In the first half of 2019, Harris lost two company cell phones within a few months of each other and failed to notify his manager about the second loss. Instead, he contacted the IT department directly. Harvey reminded Harris of the correct procedure for reporting lost phones.

Dombroski began supervising Harris in October 2019. In November, Harris notified Dombroski that he would be on vacation from November 13 to 15 and that he planned to attend a joint session between National Grid and PricewaterhouseCoopers ("PWC") scheduled for November 18 to 19, along with Bridget McCarthy from PWC. On the first day of the session, McCarthy contacted Dombroski to inquire about Harris' absence. Dombroski followed up with Harris, referencing his vacation email to her and expressing confusion about his absence at the session. Harris responded the following day, explaining that his vacation extended through November 18 and attributing the misunderstanding to an accidental omission in his email. Following this, Dombroski met with Harris to discuss his absence and how to improve future communications about out-of-office plans.

Dombroski received automatically-generated expense reports to review and approve for her four direct reports, including Harris. A January 2020 report indicated that 85 outstanding expense entries were tied to three individuals, with 82 of the unapproved expense reports belonging to Harris and dating back to July 2019. Irani-Famili forwarded the report to all her direct reports, including Harvey, who sent it to Dombroski for further follow-up. While the other two employees resolved their outstanding expenses quickly, Harris' expenses took several

Add.3

months to reconcile. Harvey consulted with Judith Dunn, the Human Resources Manager, about Harris' ongoing expense issues. Dunn, in turn, contacted National Grid's ethics department for guidance. The ethics department found no fraudulent entries in Harris' expenses but noted instances of poor documentation and a failure to adhere to expense policies. Harris was ultimately required to reimburse National Grid $316.27 for unapproved expenses. Harris admitted fault in not submitting timely receipts and acknowledged that he reviewed and accepted National Grid's expense policies when obtaining his company credit card.

On March 9, 2020, Harris met with Irani-Famili one-on-one. During their meeting, Harris recognized the need to properly submit receipts for his expenses. The two also talked about challenges minorities face in the workplace—Irani-Famili identifies as a person of Asian descent—and Irani-Famili encouraged Harris about his future at National Grid. In a follow-up meeting, after observing some of his interactions with his managers, Irani-Famili addressed Harris about his behavior and urged him to consider the perception of his actions. Harris expressed a desire for a better relationship with management to Iran-Famili.

On April 2, 2020, Dombroski delivered Harris' performance review, providing both positive feedback and areas for improvement, specifically mentioning his failure to communicate about the missed joint session with PWC. Harris felt that his performance review included retaliatory remarks related to his expenses and he criticized Dombroski on her management style. Dombroski informed Harvey, who in turn shared his concerns about Harris to Iran-Famili and Dunn, noting a contradiction between Harris' interactions with Dombroski and his stated intention to Irani-Famili about wanting a better relationship with management. Dunn expressed disappointment in Harris' conduct and requested updates on his progress.

4

Add.4

### 2.     Pandemic Performance Issues

The COVID-19 pandemic, beginning in March 2020, prompted National Grid to implement urgent measures to maintain its critical services of gas and electricity. Some employees were able to work remotely, while others, such as those in control rooms, had to remain onsite to ensure uninterrupted operations. National Grid routinely updated and distributed safety protocols, including personal protective equipment ("PPE") and quarantine guidelines.

Beginning July 13, 2020, Harris took a two-week vacation, returning to work on July 27. Harris spent the first week of his vacation visiting his parents in Ohio and the second week with his brother in California. Before his vacation, Harris was involved in planning for an in-person training event in Rhode Island on July 28-29, 2020 as part of the GBE program. The parties dispute whether there had been prior communication about Harris attending this training. PWC's COVID protocols at the time prohibited consultants from onsite activities, requiring National Grid employees to lead the training. A week before the training, Harvey requested that Dombroski check in with Harris for updates. On July 22, Dombroski called Harris to discuss the training, confirming that PPE would be provided and that he needed to adhere to COVID protocols. During this call, Harris expressed discomfort about attending and inquired about quarantine requirements, the first time he raised such concerns. Dombroski advised him to consult with National Grid's medical department regarding quarantine. On July 28, Dombroski forwarded the safety protocol guidance for the training to Harris. Harris chose not to attend the Rhode Island training, citing National Grid's policy allowing employees to work in other states.[1]

---

[1] National Grid's policy stated that US-based employees were permitted to work in other states temporarily, provided the requesting employee: (1) has approval from their direct manager; (2) the ability to perform storm duty assignments as needed; and (3) has consulted with their tax advisor to understand any tax liability resulting from working in another state.

Add.5

### 3.    Reasonable Accommodation Request, FMLA Request, & Termination

Dombroski forwarded this email from Harris to Irani-Famili and Dunn, noting that Harris had not requested to work outside Massachusetts before his departure. Irani-Famili, Dunn, Harvey, and Dombroski met to discuss a response to Harris' absence from the service territory and his assigned training. It was decided that National Grid would offer Harris the choice to return to the service territory or be deemed to have abandoned his employment, with the option of accepting nine weeks of severance if he preferred not to return.

On July 30, 2020, Dunn emailed Harris a letter stating he had violated employment terms by not returning to the service territory, informing him that failure to return would result in his job being considered abandoned. Harris responded, stating he would return to Massachusetts immediately if his request to work out of state was denied. He also disclosed having preexisting conditions that he believed put him "at a higher risk for COVID," though he did not further specify what those conditions were at that time and expressed that he would need "a 'reasonable accommodation' to work from home due to COVID." [Dkt. 1-2 ¶ 46]. Dunn replied that Harris had not obtained managerial approval to work from Ohio or California, reminding him that his role required on-site services within National Grid's territory, and instructed him to return to Massachusetts immediately. Still, Harris continued to assert that on-site work was not a requirement of his role and expressed an interest in discussing the severance details.

On July 31, 2020, Harris and Dunn discussed the severance. In the meantime, due to Harris' ongoing absence and refusal to return to National Grid's service territory, Harvey proposed interim work for Harris on a project in upstate New York that could initially be performed remotely. On August 4, 2020, Dunn emailed Harris the severance agreement. In response, Harris indicated he would consult an attorney regarding the agreement and again stated

6

Add.6

that he was hoping to take advantage of National Grid's policy allowing US-based employees to work remotely temporarily. Dunn responded that management would not permit Harris to work remotely out of state because such a request had not been made before his departure and was denied. Harris then inquired about a reasonable accommodation for his claimed preexisting conditions. When Harris was hired, he completed onboarding paperwork and participated in a pre-employment medical examination. On his self-identification form, Harris chose "*No, I Don't Have A Disability.*" Dunn notified Harris that National Grid had no record of his request for an accommodation regarding a preexisting health condition and instructed him to contact the health department for further assistance.

On the morning of August 6, 2020, Harris applied for leave under the FMLA to care for his mother, indicating he sought leave until November 2020. Of note, during his deposition, Harris testified that he sought FMLA for himself because of smoking symptoms, but also stated he never formally applied for it.[2] [Dkt. 55-1 at 28-31]. On the afternoon of August 6, 2020, Harris emailed Dunn, informing her he contacted National Grid's health department about his accommodation request and inquired about his entitlement to paid sick leave under FMLA or the Families First Coronavirus Response Act ("FFCRA"). He did not disclose that he had already submitted an FMLA application to take care of his mother. Dunn reiterated that National Grid had no record of any preexisting conditions and inquired if Harris had reviewed the severance agreement. On August 7, 2020, Dunn emailed Dombroski and Harvey to ask if Harris had mentioned being sick or taking sick time; both confirmed that Harris had not reported any sickness and that he was performing remote work. Dunn emailed Harris information about

---

[2] To be clear, contemporaneous business records from National Grid's third-party benefits administrator, Sedgwick Claims Management ("Sedgwick"), show that Harris applied for leave until November 2020 under the FMLA on August 6, 2020 to care for his mother. Although Harris never formally applied seeking FMLA leave *for himself*, he did to care for his mother and ultimately withdrew that application.

Add.7

National Grid's sick leave and FMLA policies, stating that any requests would be reviewed by National Grid's medical department. On August 7, 2020, a representative from Sedgwick called Harris. Contemporaneous call notes demonstrate that Harris wished to cancel his claim and did not want to use FMLA at that time. On August 10, 2020, Dunn provided an update to Harvey and Irani-Famili, stating she had not received a response about the severance offer and that Harris had indicated medical issues requiring accommodations. Harvey confirmed that Harris attended a work call on the previous Friday and was working. On the same day, Dombroski received a leave status report from Sedgwick indicating that Harris' case was closed and canceled at the employee's request. Dunn forwarded the leave status report to Harvey and Theresa Overdyk, Manager of National Grid's Health and Wellbeing Department, and Overdyk confirmed Harris' FMLA request had been withdrawn.

Dunn followed up on the severance offer in an email to Harris on August 11, 2020. Approximately 30 minutes after Dunn's email, Harris contacted Sarah Lavalle, a National Grid Nurse, referencing a letter from his physician and requesting a call. Harris subsequently informed Dunn that he had emailed Lavalle and was awaiting her response. On the afternoon of August 11, 2020, around 4:00 PM, Lavalle had a phone conversation with Harris, during which he expressed discomfort about returning to the office for training, disclosed a severe throat and lung condition, admitted to being a smoker, and mentioned a past car accident. Harris stated that his doctor had advised remote work accommodations and planned to contact his doctor to obtain the necessary documentation. Shortly after the call, a physician faxed a note stating:

> To Whom It May Concern: It is my medical opinion that Sandy Harris would benefit from an accommodation to work remotely during the COVID pandemic. If you have questions or concerns, please don't hesitate to call.

This note is the sole medical documentation Harris provided in justification of his request for a reasonable accommodation.

8

Add.8

After receiving the faxed doctor's note, Lavalle shared it with Overdyk. The next morning, on August 12, 2020, Overdyk informed Dunn that the medical documentation was insufficient and instructed Lavalle to communicate that to Harris. That same day, Overdyk drafted a letter outlining National Grid's reasonable accommodation process and asked Lavalle to send it to Harris. Lavalle emailed the letter to Harris, inviting him to contact her with any questions. The letter requested that Harris provide adequate medical documentation by the close of business on August 18, 2020. Harris acknowledged receiving the August 12 letter and understanding that the medical documentation was insufficient. After receiving the letter from Lavalle, Harris did not reach out to Dunn again.

The following week, Dunn inquired with Overdyk and Lavalle if Harris had provided any additional information. Both confirmed that Harris had not submitted any further information. Dunn learned from Overdyk that Lavalle had attempted to reach Harris again, but it was reported that Harris hung up on Lavalle. That evening, Dunn informed Irani-Famili and other National Grid leaders that she had not received further information from Harris and would be sending a termination notice the next morning. On the morning of August 19, 2020, Dunn again verified that Lavalle had not received any new information from Harris and then sent Harris an email and letter terminating his at-will employment.

## B.    Procedural History

On February 18, 2021, Harris filed a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD"). Following this, he requested leave to file this lawsuit, and the MCAD issued a Dismissal and Notification of Rights letter, fulfilling all conditions precedent to this action. In July 2022, Harris filed suit in Massachusetts Superior Court and on September 27, 2022, National Grid removed the lawsuit to federal court based on

Add.9

diversity jurisdiction.  On August 5, 2024, National Grid filed a summary judgment motion that is the subject of this Order.

## II.   LEGAL STANDARD

Summary judgment is meant to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Burt v. Bd. of Trustees of Univ. of R.I., 84 F.4th 42, 59 (1st Cir. 2023).  Summary judgment is granted when the moving party demonstrates that there is no genuine dispute as to any material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A genuine dispute involves evidence that, when viewed in the light most favorable to the nonmovant, allows a rational factfinder to resolve the issue in favor of either, and material facts are those that could impact the outcome of the case under applicable law. Gattineri v. Wynn MA, LLC, 63 F.4th 71, 84-85 (1st Cir. 2023).  The opposing party bears the burden of producing specific facts to counter the motion for summary judgment and cannot rely on conclusory allegations or speculation. Theidon v. Harvard Univ., 948 F.3d 477, 494 (1st Cir. 2020).  Even though the nonmovant for summary judgment is entitled to all reasonable inferences from the record, there are limits; for instance, the court will not draw "unreasonable inferences" or "credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective." Alston v. Int'l Ass'n of Firefighters, Loc. 950, 998 F.3d 11, 24 (1st Cir. 2021) (quoting Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007)).  This remains true in discrimination and retaliation cases where motive is at issue; a nonmovant cannot rely "merely upon conclusory allegations, improbable inferences, and unsupported speculation." River Farm Realty Tr. v. Farm Fam. Cas. Ins. Co., 943 F.3d 27, 41 (1st Cir. 2019) (quoting Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 855-56 (1st Cir. 2008)).

Add.10

## III.    DISCUSSION

This Court will first address Harris' state law discrimination and retaliation claims, which are analyzed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, which applies when a plaintiff lacks direct evidence of discrimination. 411 U.S. 792 (1973). At the first stage, the plaintiff must establish a prima facie case of discrimination or retaliation. Id. at 802. Then the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse employment action. Id. At the final stage, the burden shifts back to the employee to demonstrate that the employer's explanation was a pretext for discrimination. Id. at 804. Pretext may be established in various ways, including highlighting "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation. Miceli v. JetBlue Airways Corp., 914 F.3d 73, 82 (1st Cir. 2019) (quoting Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 168 (1st Cir. 1998)). Throughout this process, the ultimate burden of persuasion remains with the plaintiff. See Ray v. Ropes & Gray LLP, 799 F.3d 99, 113 (1st Cir. 2015). This Court will address each claim in turn.

### A.    Disability Discrimination

The *McDonnell Douglas* burden-shifting framework applies to disability discrimination claims under Chapter 151B. See Brader v. Biogen Inc., 983 F.3d 39, 54-55 (1st Cir. 2020). In Massachusetts, it is unlawful for an employer to dismiss, or refuse to hire, rehire, or advance in employment, or otherwise discriminate against any qualified individual claiming to have a disability, if that individual can perform the essential functions of the position with reasonable accommodations. Mass. Gen. Laws ch. 151B, § 4(16). An employer may only avoid this obligation by demonstrating that the required accommodation would impose an undue hardship on the employer's business. Id. National Grid seeks summary judgment on Harris' disability

11

Add.11

discrimination claim, asserting that he has not established the required elements: (1) he is disabled under the law; (2) he is a qualified individual capable of performing essential job functions with or without accommodations; and (3) discharged in whole or in part due to his disability. See Sarkisian v. Austin Preparatory Sch., 85 F.4th 670, 675 (1st Cir. 2023). Harris responds by arguing that his respiratory issues and heightened risk factors, such as asthma and high blood pressure, are recognized disabilities, his role did not necessitate in-person attendance, and he could perform his duties with reasonable accommodations. National Grid counters that Harris previously certified he had no disabilities, maintains it engaged appropriately in the interactive process for accommodations, and challenges Harris' assertions regarding the essential functions of his job, emphasizing that in-person attendance for training is crucial. Additionally, National Grid points out that Harris rescinded his request for unpaid FMLA leave, which undermines his accommodation claims.

For an employee's actions to qualify as a request for accommodation, it is necessary to clearly communicate to the employer that the employee is entitled to and in need of such accommodation. Miceli, 914 F.3d at 82. The request must clearly articulate the need for accommodation and connect the employee's disability to the requested action. Id. at 83 (citing Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 89 (1st Cir. 2012)). Requests that lack specificity or clarity do not meet the threshold for actionable accommodation requests. Miceli, 914 F.3d at 83. Id. If the requested accommodation is inappropriate or unsuitable, the employer is still required to make a reasonable effort to determine the appropriate accommodation through a flexible, interactive process involving both parties. Miceli, 914 F.3d at 82. Chapter 151B does not, however, impose an obligation on employers to unilaterally modify their policies in the absence of a specific, requested accommodation from the employee. Id.

12

Add.12

When an employer claims that standard policies support an adverse employment action against an individual with a disability, that individual may illustrate pretext by demonstrating that the policies were not applied uniformly. See id. at 84. This can be accomplished by showing a departure from clearly defined policies or inconsistent application of those policies to similarly situated employees. Id. A uniform application of a facially neutral policy can serve as a legitimate, non-discriminatory reason for termination, even when the employee has a disability. Id. at 82 (citing Leary v. Dalton, 58 F.3d 748, 754 (1st Cir. 1995)). The employee must provide evidence that the employer applied the relevant policies disparately. See Ing v. Tufts Univ., No. CV 21-10032-RGS, 2022 WL 7683485, at *5 (D. Mass. Oct. 13, 2022), aff'd, 81 F.4th 77 (1st Cir. 2023). But, if the employee has not engaged in procedures available through the employer to address or dispute the issues leading to the adverse action, this inaction can undermine their claim. See Miceli, 914 F.3d at 84 (citing Mesnick v. Gen. Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991) (holding that in discrimination case, courts may not "sit as super personnel departments" to assess the merits or rationality of employers' nondiscriminatory business decisions)). Finally, an employer is not obligated to give an employee their preferred accommodation. Oquendo v. Costco Wholesale Corp., 857 F. App'x 9, 11-12 (1st Cir. 2021) (citing Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 68 (1986); Feliciano v. Rhode Island, 160 F.3d 780, 787 (1st Cir. 1998)).

Here, Harris stumbles at the starting gate. He contends that respiratory issues and health conditions exacerbated by COVID-19 qualify as disabilities but, at the time of his hiring, he certified that he had no disabilities or breathing-related symptoms. [Dkt. 61 ¶ 4]. This certification undermines his current claim of disability. Nonetheless, the Court assumes without deciding that Harris' claimed preexisting conditions, coupled with COVID-19, makes him a disabled person under 151B. Next, Harris must demonstrate that he is a "qualified handicapped

13

Add.13

person," capable of performing the essential functions of his job with or without reasonable accommodations.

National Grid asserts that travel and on-site work are essential functions of his role. [Dkt. 61 at 54-53]. While Harris claims that other Change Management Analysts work remotely and his job description does not specifically mandate in-person attendance, essential functions are determined not merely by job descriptions but through an analysis of the actual duties performed and the employer's operational needs. The law acknowledges that essential functions may encompass requirements not explicitly stated in the job description. Oquendo, 857 F. App'x at 12 n.3 ("An employer's official job description is relevant—but not dispositive—in determining what the essential functions of a position are."). In this context, this Court agrees with National Grid that Harris' contradictory statements and attempts to minimize his role do not alter the reality of his responsibilities. His actual duties included on-site training—an aspect he acknowledged—and he has not provided sufficient evidence to indicate he could perform these essential functions effectively without in-person involvement. The threshold for showing that one can perform essential job functions with or without accommodations is a rigorous one, requiring more than anecdotal evidence; rather, it necessitates a clear demonstration of capability despite the claimed disability. See, e.g., Sarkisian, 85 F.4th 670 (affirming summary judgment on a teacher's action against the school because regular, in-person attendance was an essential function of her role and there was no facially reasonable accommodation the school could propose); Richardson v. Friendly Ice Cream Corp., 594 F.3d 69 (1st Cir. 2010) (granting summary judgment on a restaurant employee's claims who was afflicted with a shoulder injury and not capable, with or without reasonable accommodation, of performing essential functions like manual tasks); Phelps v. Optima Health, Inc., 251 F.3d 21 (1st Cir. 2001) (affirming

14

Add.14

summary judgment and finding a hospital was not required to exempt a nurse with a back disability from performing essential functions, nor reallocate her essential functions to other employees). While Harris' suggestions for accommodation reflect an effort to be flexible, they do not adequately address the necessity of fulfilling fundamental job duties. Requests for unpaid leave or the delegation of his essential responsibilities to colleagues fail to qualify as reasonable accommodations since they would fundamentally undermine his role and potentially impose undue hardship on National Grid. Courts recognize that reasonable accommodations must facilitate an employee's ability to perform their job, rather than alleviate the employee from those responsibilities altogether. See Mulloy v. Acushnet Co., 460 F.3d 141, 148 (1st Cir. 2006).

Regarding the final element of Harris' claim, he must prove that National Grid discriminated against him based on his claimed disability. However, he has not substantively established that his alleged disability was a motivating factor in any adverse employment action taken against him. National Grid engaged in the interactive process and made a good faith effort to evaluate his needs—including his temporary reassignment to the upstate NY project that had not yet entered a phase requiring an in-person presence. Employees are required to engage in this interactive process, too, in good faith to develop reasonable accommodations. Caruso v. Delta Air Lines, Inc., 113 F.4th 56, 77 (1st Cir. 2024). If the employee does not cooperate in the interactive process in good faith, the employer cannot be held liable for a failure to provide reasonable accommodations. Id. (citing Enica v. Principi, 544 F.3d 328, 339 (1st Cir. 2008)). Harris' failure to submit sufficient medical documentation concerning his claimed disability and to cooperate in the interactive process hinders his ability to substantiate his requests for accommodations.

Add.15

Examining whether National Grid's actions constituted a failure to accommodate, the Court notes that a reasonable accommodation must not impose undue hardship on the employer. See Mass. Gen. Laws Ch. 151B, § 4(16). National Grid has outlined how adjustments to the role and responsibilities might detrimentally impact business operations, especially given the size of the organization and the nature of the work involved, as well as Harris' expertise in his workstream. Courts typically defer to employers' assessments of undue hardship as they possess a deeper understanding of their operational dynamics. Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 88 (1st Cir. 2012). Ultimately, Harris has not demonstrated any discriminatory animus motivating any actions taken by National Grid, nor has he established a nexus between his asserted disability and the termination he faced. Given these facts, including the lack of corroborative evidence relating to his disability, National Grid's documented efforts to engage with him, and the absence of any discriminatory intent or actions, summary judgment is **GRANTED** in favor of National Grid on Harris' disability discrimination claim.

## B.    Race Discrimination

In Massachusetts, race discrimination claims are evaluated through the *McDonnell Douglas* burden-shifting framework. See Stratton v. Bentley Univ., 113 F.4th 25, 38 (1st Cir. 2024). Harris alleges race discrimination under Chapter 151B, claiming that National Grid acted with "evil motive or reckless indifference" toward his rights. National Grid seeks summary judgment, asserting this claim lacks substantial evidence, particularly in identifying any adverse actions related to his race. While Harris claims he was singled out for time-off requests and issues related to expense handling, National Grid argues that these examples reflect his failure to comply with company policies rather than racial discrimination. Harris contends that is pretext,

Add.16

as his status as one of the few Black employees and a conversation with Irani-Famili about workplace challenges for minorities instead implies discriminatory intent.

In this instance, assuming without deciding that Harris has made a prima facie race discrimination claim, National Grid satisfied the second step of the *McDonnell Douglas* burden-shifting framework by providing legitimate nondiscriminatory justification for Harris' termination, while Harris fails to present circumstantial evidence demonstrating a clear nexus between his termination and racial discrimination. The references he provides do not establish such a connection.  For instance, regarding his November 2019 time-off request, Harris was not disciplined for missing a scheduled joint session; rather, he received constructive feedback to prevent future misunderstandings.  He provides no factual support to show he was treated differently than similarly situated employees.  Harris also alleges he faced greater scrutiny than his colleagues regarding expenses; however, on a four-member team, he was solely responsible for 82 out of 85 outstanding expense reports.  The evidence indicates that his colleagues with similar expense issues were subject to the same company policies, regardless of race, and successfully resolved their few outstanding expenses.  Additionally, Harris admitted to mismanaging his expenses, which were resolved after he repaid funds for undocumented claims. Separately, Harris references a conversation with Irani-Famili about workplace challenges faced by minorities but fails to connect this conversation to any specific grievances at National Grid.[3] Such isolated instances do not constitute evidence of discriminatory intent—particularly when the comment conveys solidarity rather than animus.  Lastly, his requirement to return to the service territory following his July 2020 vacation aligns with his job responsibilities.  The evidence presented indicates that Harris' termination was based on legitimate business reasons

---

[3] Harris additionally alleges, and National Grid disputes, that Irani-Famili pointed to the skin on the back of her hand at some point during the conversation and remarked, "I know it's hard sometimes because of this."

17

Add.17

rather than racial animus. Since Harris has not rebutted National Grid's legitimate, nondiscriminatory basis for his termination with evidence of pretext or discriminatory motive, summary judgment is **GRANTED** in favor of National Grid on his race discrimination claim.

### C. State Law Retaliation

Harris next alleges that National Grid terminated his employment as retaliation for his request for accommodation. Harris' retaliation claim, like his discrimination claims, is analyzed under the *McDonnell Douglas* burden-shifting framework. See Ing v. Tufts Univ., No. CV 21-10032-RGS, 2022 WL 7683485, at *5–6 (D. Mass. Oct. 13, 2022), aff'd, 81 F.4th 77 (1st Cir. 2023). Harris contends that he can pursue a retaliation claim regardless of whether he is disabled or entitled to accommodations, provided his requests were made in good faith. He argues that the timing of his accommodation request and termination—approximately three weeks apart—supports an inference of causation. To bolster his claim, Harris presents circumstantial evidence, including a statement from Dunn asserting that his termination stemmed solely from his failure to return to the service area. Additionally, after Harris' termination, Dunn instructed others to compile information on his expenses and cell phone usage, implying those were only post-hac justifications for his dismissal. Harris argues that these facts suffice to show his request for reasonable accommodation was a motivating factor in his termination.

A retaliation claim cannot rely solely on evidence that the protected activity was one factor among many in the employer's decision. Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 359-60 (2013) (distinguishing between the "motivating-factor" and "but-for" causation standards). In other words, the plaintiff must demonstrate that the employer would not have taken the adverse action but for the desire to retaliate. Id. at 352. This standard prevents poorly performing employees from circumventing termination solely due to their engagement in

Add.18

protected conduct. Stratton, 113 F.4th at 44 (citing Nassar, 570 U.S. at 358). An inference of causation may arise if an adverse action occurs against a satisfactorily performing employee immediately after the employer becomes aware of the protected activity. Mole v. Univ. of Massachusetts, 442 Mass. 582, 592 (2004). However, if problems with an employee predate the employer's knowledge of their protected activity, it is impermissible to infer that subsequent adverse actions are motivated by retaliation. Id. at 594. For example, in Pearson v. Mass. Bay Transp. Auth., the First Circuit held that a plaintiff alleging retaliation under Chapter 151B did not demonstrate a sufficient causal connection since their supervisors had recommended termination before the protected activity occurred. 723 F.3d 36, 42 (1st Cir. 2013). Even if the final decision to terminate the plaintiff happened after the protected activity, the plaintiff needed to demonstrate that the outcome would have changed had the employer not known of the protected activity. See id. Similarly, in Miceli, the court affirmed summary judgment in favor of the employer because the appellant was under suspension and review for termination when she filed her MCAD complaint. 914 F.3d at 85.

The present case closely follows *Pearson*. Harris claims he was terminated solely due to his accommodation request. While Harris' termination is undoubtedly an adverse employment action, his retaliation claim falls short because he cannot demonstrate a causal connection between his request for a reasonable accommodation and his termination. Harris' conflicts with his managers seemingly began when he bypassed them to report a second lost phone to IT directly within months of losing his first phone, which surprised Harvey and resulted in a reminder to adhere to company protocols. Shortly thereafter, Dombroski, who was newly managing Harris, was taken aback to learn from a PWC employee that Harris had not shown up for a scheduled event. Then, as his managers endeavored to assist him in resolving outstanding

Add.19

expense reports, Harris persistently questioned why he was being scrutinized regarding expenses on the company credit card. In light of his numerous unapproved expenses and behavioral issues, National Grid's ethics department was consulted for guidance and conducted a separate review of his expense entries. Although Harris' conduct prior to the pandemic reportedly played no role in National Grid's decision to terminate him, that his conduct was perceived as potentially unethical months before any claims of protected activity is significant.

Harris' argument relies solely on the temporal proximity of his request for reasonable accommodation and his termination; however, this reliance is misplaced. Mere temporal proximity does not suffice to raise an inference of retaliation when the employer articulates a non-retaliatory basis for its actions. See Hodgens, 144 F.3d 151. National Grid informed Harris it would consider him to have abandoned his job if he did not return to the service area prior to his reasonable accommodation inquiry or request for leave under the FMLA. The absence of storm duties at that time and the temporary arrangement for remote work do not negate National Grid's policy requirements affecting Harris' employment status. Despite the warning and his awareness of the potential job abandonment, Harris did not return to the service area. Moreover, weeks after Dunn instructed him to engage with National Grid's medical department to establish a record of his disability and accommodation needs, Harris did not complete the process. Given the legitimate explanations presented for his dismissal, the temporal connection becomes nothing more than speculative. The record lacks evidence suggesting that National Grid's decision was influenced by Harris' accommodation request; the justifications provided align with company policy and operational requirements. This Court refrains from inferring a causal connection in this case, particularly when negative performance evaluations predate his protected activity. Under these circumstances, Harris fails to meet the legal standards outlined in Chapter 151B.

Add.20

Therefore, National Grid's motion for summary judgment regarding the retaliation claim is

**GRANTED**.

### D.     Family and Medical Leave Act

The FMLA aims to support employees in balancing their work and family lives. See 29

C.F.R. § 825.101; 29 U.S.C. § 2601(b)(1)-(2). FMLA allows an "eligible employee" to take

reasonable leave, up to a maximum of twelve weeks within a twelve-month period, for personal

medical reasons or to care for a family member with a serious medical condition. 29 U.S.C. §

2612. Its provisions are divided into those that establish substantive rights and those that protect

the exercise of these rights. See Hodgens, 144 F.3d at 159. It is crucial to distinguish

interference claims from retaliation claims under the FMLA, as interference involves the denial

of substantive rights, while retaliation centers on an employer's response to an employee's

exercise of those rights. Carrero-Ojeda v. Autoridad de Energía Eléctrica, 755 F.3d 711, 722 (1st

Cir. 2014). In his Complaint, Harris alleges that National Grid both interfered with and retaliated

against him by terminating him. [Dkt. 1-2 at 10-11]. This Court will address each claim in turn.

### 1.     Retaliation in Violation of the FMLA

To establish a claim of retaliation under the FMLA, the plaintiff must demonstrate: (1) he

engaged in a protected activity by requesting FMLA leave; (2) he experienced an adverse

employment action; and (3) a causal link exists between his leave request and the employer's

adverse action. Thompson v. Gold Medal Bakery, Inc., 989 F.3d 135, 144 (1st Cir. 2021). The

plaintiff must show that the employer "terminated him not because of any inappropriate behavior

on his part, but in retaliation for his [request for] protected medical leave." Colburn v. Parker

Hannifin/Nichols Portland Div., 429 F.3d 325, 335 (1st Cir. 2005). This necessitates

demonstrating a causal connection between the termination and the employer's retaliatory intent.

21

Add.21

To facilitate this, the First Circuit employs the *McDonnell Douglas* burden-shifting framework, even in the absence of direct evidence of retaliation. Id. Under this framework, first, a plaintiff must present sufficient evidence to establish a prima facie case of retaliation; subsequently, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the termination. If the employer does so, the presumption of discrimination is overcome, and the plaintiff retains the ultimate burden of proving that the employer's reason was a pretext for retaliation related to the protected FMLA leave. Hodgens, 144 F.3d at 160-161.

Harris struggles to establish the final element of his retaliation claim. While the first two elements—protected activity and adverse employment action—can be considered satisfied, the critical question remains whether National Grid terminated Harris due to his withdrawn request for FMLA leave. Harris attempts to link the timing of his FMLA leave request to his termination, arguing that the temporal proximity between his request on August 6 and his termination fewer than two weeks later is sufficient to demonstrate causation. [Dkt. 56 at 18]. The Court finds this argument unpersuasive. Temporal proximity alone cannot establish causation if, as the circumstances indicate, "it is almost certain that the decision to fire" him "was already in the works and had nothing to do with" his leave request. Germanowski v. S. Constr. Group, LLC, 854 F.3d 70, 74-75 (1st Cir. 2017). Moreover, even in viewing the evidence favorably to Harris, it is implausible that Dunn and Irani-Famili would terminate him due to an FMLA claim that had yet to be filed. Harris must demonstrate that those responsible for his termination were aware of his protected activity, as National Grid cannot be motivated to retaliate against an action of which it was unaware. See Ameen v. Amphenol Printed Circuits, Inc., 777 F.3d 63, 70 (1st Cir. 2015) (citing Medina-Rivera v. MVM, Inc., 713 F.3d 132, 139 (1st Cir. 2013)). Harris' FMLA retaliation claim also ignores that he was warned of job

22

Add.22

abandonment before he inquired and applied for FMLA leave. In conclusion, without sufficient evidence to substantiate a causal link between his withdrawn FMLA leave request and the adverse employment action taken against him, Harris' claim for FMLA retaliation does not hold. Thus, National Grid is entitled to summary judgment regarding this claim as well.

### 2.    Interference with Protected Rights Under the FMLA

Under the FMLA, an employer is prohibited from impeding an employee's ability to take leave to which they are entitled. To prevail on an FMLA interference claim, a plaintiff must establish five elements: (1) he is an eligible employee under the FMLA; (2) the defendant is an employer as defined by the FMLA; (3) he was entitled to take leave under the FMLA; (4) he provided the defendant with notice of his intention to take leave; and, (5) he was denied benefits to which he was entitled under the FMLA. Boadi v. Ctr. for Hum. Dev., Inc., 239 F. Supp. 3d 333, 343-44 (D. Mass. 2017). Specifically, FMLA interference claims focus on whether an employer has provided its employee the entitlements outlined in the FMLA or, in some cases, whether the employer discouraged the employee from exercising their FMLA rights. Stratton, 113 F.4th at 46. "If dismissal would have occurred regardless of employee's request for FMLA leave, an employee may be dismissed even if dismissal prevents her exercise of her right to an FMLA leave." Boadi, 239 F. Supp. 3d at 344.

In the present case, the undisputed facts reveal that National Grid fulfilled its obligations under the FMLA. Harris acknowledges that he was never denied the FMLA leave he submitted to care for his mother—he withdrew that request before any management became aware of it.[4]

---

[4] Harris claims there is a genuine dispute of material fact regarding whether he ever withdrew his FMLA claim; however, this Court finds that the dispute is neither genuine nor material. Hearsay is inadmissible unless it fits within a recognized exception. See Fed. R. Evid. 802; Bradley v. Sugarbaker, 891 F.3d 29, 34 (1st Cir. 2018). To qualify under Fed. R. Evid. 803(6), a record must be "kept in the course of a regularly conducted activity of a business" and "making the record was a regular practice of that activity." Fed. R. Evid. 803(6)(B); 803(6)(C). Sedgwick's contemporaneous call notes, as a record that was standard practice to keep and compile in its ordinary course of business, falls into this exception and this Court accepts the record for its facial truth.

Add.23

While Harris argues that National Grid's "continual monitoring of [his] FMLA application" leading up to his termination suggests the company timed his dismissal to prevent him from completing his application, this assertion lacks substantive support. [Dkt. 56 at 18-19]. Additionally, Harris references two Department of Labor regulations related to the FMLA as evidence of National Grid's alleged interference. First, he cites to 29 C.F.R. § 825.305(b), which requires employees to provide any requested medical certification for FMLA leave within 15 calendar days of their employer's request. Second, he mentions § 825.305(d), which mandates employers to inform employees about the consequences of failing to provide adequate certification. Harris' claim fails to demonstrate that National Grid discouraged him from taking FMLA leave. In fact, Dunn provided Harris with guidance and encouraged him to engage with National Grid's medical team, which followed up with him regarding the submission of the required documentation. Therefore, even when considering the facts in the light most favorable to Harris, the evidence does not substantiate a claim of unlawful interference under the FMLA and National Grid is entitled to summary judgment on this claim.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [Dkt. 47] is **GRANTED.**

**SO ORDERED.**

Dated: March 26, 2025

/s/ Angel Kelley
Hon. Angel Kelley
United States District Judge

24

Add.24

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SANDY HARRIS, JR., | ) |
| Plaintiff, | ) |
|  | )  Civil Action No. 1:22-CV-11628-AK |
| v. | ) |
| NATIONAL GRID USA SERVICE COMPANY, INC., | ) |
| Defendant. | ) |

## JUDGMENT

**ANGEL KELLEY, D.J.**

In accordance with the Court's Memorandum and Order [Dkt. 80] entered on March 26, 2025, it is hereby ORDERED:

Judgment entered for Defendant.

By the Court:

Dated: March 26, 2025

/s/ Miguel A. Lara
Deputy Clerk

Add.25