No. 25-1404

# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

SANDY HARRIS, JR.,

*Plaintiff-Appellant,*

-against-

NATIONAL GRID USA SERVICE COMPANY, INC.,

*Defendant-Appellee.*

*On Appeal from Order and Judgment of the U.S. District Court for the District of Massachusetts, 1:22-cv-11628-Ak Rendered by Hon. Angel Kelley, U.S.D.J.*

## REPLY BRIEF FOR THE PLAINTIFF-APPELLANT

RESPECTFULLY SUBMITTED,

**SANDY HARRIS, JR.**

BY HIS ATTORNEYS:

| **LAW OFFICE OF ALAN H. CREDE, ESQ.** | **LAW OFFICE OF ROBERT S. MANTELL** |
|---|---|
| 185 Devonshire Street, Suite 302 | 47 Liberty Avenue |
| Boston, MA  02110 | Somerville, MA  02110 |
| (617) 648-8263 | (617) 470-1033 |
| alan.crede@credelaw.com | RMantell@TheEmploymentLawyers.com |
| 1st Cir. Bar No. 1195128 | 1st Cir. Bar No. 31754 |
| *Attorneys for Plaintiff-Appellant* | *On the brief* |

<u>TABLE OF CONTENTS -- BRIEF</u>

*Page*

TABLE OF AUTHORITIES ................................................................................................ii

REPLY ARGUMENTS ................................................................................................... 1

    I.      THE BUT-FOR STANDARD APPLIES .................................................. 1

    II.     DEFENDANT'S PRE-EXISTING ANTIPATHY TO REMOTE
           WORK DOES NOT INSULATE IT FROM LIABILITY ...................... 1

    III.    THE "SEQUENCE" ARGUMENT DOES NOT SUPPORT THE
           DISMISSAL OF PLAINTIFF'S RETALIATION CLAIMS.................. 3

          A.     EARLIER REASONABLE ACCOMMODATION
                  INQUIRIES ............................................................................... 4

          B.     THE ASSERTION OF MISCONDUCT WAS
                  PRETEXTUAL ........................................................................... 7

          C.     THE DECISION TO TERMINATE WAS NOT MADE
                  AS OF JULY 30 .......................................................................... 9

          D.     THE JULY 30 THREAT WAS DISTINGUISHABLE
                  FROM THE AUGUST 19 TERMINATION ............................. 12

    IV.    PLAINTIFF DID NOT WAIVE HIS ARGUMENTS WITH
           RESPECT TO THE SEQUENCING ISSUE ...................................... 17

    V.     THERE WAS NO PATTERN OF MISCONDUCT THAT
           CAUSED THE TERMINATION ........................................................ 18

    VI.    DEFENDANT EXPECTED PLAINTIFF TO FILE A REQUEST
           FOR FMLA LEAVE ......................................................................... 19

CONCLUSION............................................................................................................. 20

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ......................................... 22

CERTIFICATE OF SERVICE ................................................................................... 23

TABLE OF AUTHORITIES

**CASES:**

Charles v. Leo, 96 Mass. App. 326 (2019) ................................................................. 13

Duckworth v. Pratt & Whitney, Inc., 152 F.3d 1 (1st Cir. 1998) ................................. 20

Fournier v. Mass., 2021 U.S. App. Lexis 27676 (1st Cir.) ........................................... 13

Kelley v. Corr. Med. Servs., 707 F.3d 108 (1st Cir. 2013) ............................................. 8

Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105 (1st Cir. 2024) ............................. 8, 13

Kolodziej v. Smith, 412 Mass. 215 (1992) ..................................................................... 1

Kulniszewski v. Swist, 1998 U.S. Dist. Lexis 3397 (W.D.N.Y.), aff'd 175 F.3d
1008 (2d Cir. 1999) ......................................................................................................... 6

Moore v. Indus. Demolition LLC, 2025 U.S. App. Lexis 11530 (1st Cir.) ................... 1

Romano v. Lawrence, 2025 Mass. App. Unpub. Lexis 607 ................................... 13, 14

Willnerd v. First Nat'l Neb., Inc., 588 F.3d 770 (8th Cir. 2009) ................................... 8

Woodson v. Scott Paper Co., 109 F.3d 913 (3d Cir. 1997) ......................................... 12

I.      THE BUT-FOR STANDARD APPLIES

Defendant concedes that a "but-for" causation standard applies to Plaintiff's retaliation claims, which permits liability where retaliation is one of a number of motives and/or causes. *Opposition* pp. 20-21. Thus, Defendant tacitly agrees that the District Court erred in holding that a retaliatory motive cannot merely be "one factor among many in the employer's decision" in order to support liability. (A1520). It appears uncontested that the District Court articulated too stringent a causation standard.

II.     DEFENDANT'S PRE-EXISTING ANTIPATHY TO REMOTE WORK DOES NOT INSULATE IT FROM LIABILITY

Plaintiff may prevail, even if the Defendant's antipathy toward remote work arose prior to, and independent of any request for reasonable accommodation. Ordinarily, an employer is free to terminate an employee for requesting a workplace modification. Kolodziej v. Smith, 412 Mass. 215, 221-222 (1992). However, an employer *is not* free to terminate an employee for seeking the *same* modification, when it is framed as a good faith request for a reasonable accommodation. Moore v. Indus. Demolition LLC, 2025 U.S. App. Lexis 11530 (1st Cir.) at 21. Thus, even if this court were to find that Plaintiff did not lodge a request for reasonable accommodation in July, and that the July 30 threat was not retaliatory, Defendant is not free to act on the same animus against a request for remote work in August, after Plaintiff had pursued protected requests for

1

accommodation. Once Plaintiff sought remote work as part of a request for reasonable accommodation, his request became protected. And he may not be terminated for fear that he would continue to pursue that goal.

At root, Defendant's position is that its pre-existing antipathy for remote work somehow immunizes its later retaliation against Plaintiff for seeking remote work as a reasonable accommodation. This is inconsistent with the law. Indeed, the whole point of requiring reasonable accommodations is to force employers to make changes that they otherwise would not want to make. EEOC Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the ADA (October 17, 2002), pt. 24 (employers may be required to modify workplace polices in order to provide reasonable accommodations). Thus, having framed his request as one seeking reasonable accommodation, Plaintiff may not be terminated for pursuing that goal.

In this case, Defendant was hostile to the notion of remote work and repeatedly asserted its desire that Plaintiff return to on-site work. (A712,A994). However, a jury could find that it was Defendant's antipathy to the request for reasonable accommodation that caused the termination, particularly where Plaintiff had offered to "drive to MA immediately" if his request for accommodation were denied. Defendant could have had what it claimed it wanted.

2

Instead, Defendant did not want to give Plaintiff the option of returning. It moved directly to termination, without warning. (A1454,A1157,A1455,A1155, A1239-1247). A reasonable interpretation of the evidence is that Defendant made this extreme choice, precisely because it feared and expected Plaintiff to continue pursuing efforts to obtain reasonable accommodation.  This is an illegal motive.

III.    THE "SEQUENCE" ARGUMENT DOES NOT SUPPORT THE DISMISSAL OF PLAINTIFF'S RETALIATION CLAIMS

Defendant's sequencing argument is based on the following narrative.  First, that Plaintiff did not make a reasonable accommodation inquiry prior to the July 30, 2020 letter. *Opposition*, at 17-18 ("National Grid informed Harris it would consider him to have abandoned his job if he did not return to the service area *prior* to his reasonable accommodation inquiry").  Second, that Harris engaged in "misconduct" by failing to attend an on-site training on July 28 and 29. *Opposition*, at 22; A1228. Third, that Defendant decided on July 30, 2020 that "the consequence of his misconduct would be termination of employment." *Opposition*, at 22. Fourth, while Plaintiff was actually terminated on August 19—after he formalized his request for reasonable accommodation—the August 19 date is irrelevant because "National Grid decided (and informed Plaintiff) [on July 30]— before his protected activity—that the consequence of his misconduct would be termination." *Opposition*, at 22.

3

However, the record evidence establishes a different narrative. The record shows that Plaintiff inquired about reasonable accommodation before July 30, that Defendant knew that Plaintiff did not engage in misconduct, and that the July 30 communication was not a determination that Harris is, was, or will be fired for misconduct. Rather, the July 30 letter sought to threaten Harris in an effort to coerce Harris to cease and/or withdraw his paired request for reasonable accommodation and remote work. The evidence shows that only sometime after August 7, when Harris continued with his efforts to inquire into and/or seek the reasonable accommodations of remote work and/or FMLA leave, and formalized his request by providing a doctor's note to Employee Health, did Defendant make the decision to fire Plaintiff.

An analysis of the evidence, as set forth below, reveals it to be incompatible with Defendant's narrative and consistent with the Plaintiff's theories of liability.

A.    EARLIER REASONABLE ACCOMMODATION INQUIRIES

There is ample evidence that Plaintiff initiated his reasonable accommodation inquiry *before* the Defendant's July 30 threat, and that Defendant understood him to be making such inquiry. On July 22, 2020, in response to Dombrowski's request that Harris attend an in-person training on July 28 and 29, Harris responded that he could not do it, was not "comfortable" with in-person training due to COVID, and *requested a reasonable accommodation*. (A1054,

4

A1422-25). In response, Dombrowski directed Harris to contact the "medical" department. (A877). Notably, "medical" is the department which handles reasonable accommodation requests for National Grid employees. (A986,A594, 969). Dombrowski's direction of Harris to contact "medical" reflected her understanding that Harris was requesting permission to avoid the training based on his medical condition and to request reasonable accommodation.

Consistent with Dombrowski's instruction to call "medical," Harris did so and confirmed this contact with an email to Dombrowski. (A1427,A1086). On July 28, 2020, Harris emailed Dombrowski that Employee Health ("medical") had informed him that, as an office employee, he was not required to be on-site during COVID, that, upon return to Massachusetts he would need to quarantine for fourteen (14) days, and further expressed concern about the "current health crisis." (A302-303). In that email, Harris wrote to Dombrowski, stating, "I elect to continue working remotely to not further compromise myself to increased chances of COVID exposure." (A303). Thus, Defendant knew that Plaintiff had contacted the medical department and had sought a reasonable accommodation based on his medical concerns.

After conducting a meeting in which Plaintiff's concerns about working on-site during COVID were discussed, and consulting with in-house counsel, Dunn sent the July 30 letter to Plaintiff. (A953,A955-956,A72-73,A569-571,A594,A685,

5

A853, A949-955,A973). The letter to Plaintiff states, in relevant part, "The essential functions of your position within the Transformation Office required you to provide on-site services within our three-state geographic territory, NY, MA and RI." (A1228).

The language "essential functions" is the parlance of reasonable accommodation/disability law.  It is clear that National Grid was analyzing Plaintiff's health concerns and request to work remotely as a request for reasonable accommodation. Thus, in light of all of the foregoing, a jury could find that Harris lodged a protected inquiry about a reasonable accommodation prior to Defendant's July 30 communication and/or that Defendant understood him to be making a request for, or inquiry into reasonable accommodation prior to July 30. Indeed, a jury need look no farther than Harris' testimony that he requested reasonable accommodation in conversation with Dombrowksi. (A1054).

In addition, it is unlawful to deny employment based on an employee's "perceived need" for reasonable accommodation. Kulniszewski v. Swist, 1998 U.S. Dist. Lexis 3397 (W.D.N.Y.), at 11, aff'd 175 F.3d 1008 (2d Cir. 1999). Given that Plaintiff initiated protected inquiries about reasonable accommodation before the July 30 letter, Defendant's sequencing argument is broken, because the Defendant's hostility, as evidenced by the July 30 threat, was directed precisely at Plaintiff's request for remote work/reasonable accommodation.

B.     THE ASSERTION OF MISCONDUCT WAS PRETEXTUAL

The next pillar of Defendants' crumbling edifice is its claim to believe that Plaintiff engaged in misconduct by failing to attend the training on July 28 and 29. *Opposition*, p. 22.  The Defendant's July 30 letter accused Plaintiff of not "perform[ing] the work you were hired to do . . . [and that] Due to your infringement, other staff employees had to step in to perform your assigned duties, which is unacceptable." (A1228). According to Defendant, this letter is a response to Plaintiff's misconduct that was complete as of July 30, for which Defendant determined that termination was the proper consequence. *Opposition*, at 22.

But a reasonable jury could find the accusation of misconduct to be a façade, in support of a threat (return or else) made to coerce Plaintiff into withdrawing his inquiries concerning reasonable accommodation and remote work. An enormous amount of evidence supports this interpretation of events and contradicts that of Defendant.

A reasonable jury could find that Defendant had no expectation that Plaintiff would attend the July 28 and 29 trainings and that he did not engage in any misconduct by his absence. First, given that Plaintiff was out-of-state on an approved trip, Defendant knew that its own 14-day quarantine policy precluded Plaintiff from returning and working on-site at the training. (A857, A971-72, A1086-93, A1430-31).

7

Second, Plaintiff was informed by Employee Health that, as an office employee, he was not required to work on-site. (A1086-1093,1427-28). On July 28, Plaintiff reminded Defendant that this temporary policy and the quarantine both precluded his attendance. (A1427-28,A1086-87). Third, Plaintiff was not scheduled to work the training (A1422-25, A873-74, A1033), and the request for his attendance was not framed as a requirement (A872-73, A1423). Any one of these facts means that Defendant's protests of "misconduct" were knowingly false and, therefore, pretextual.

Consequently, a jury could infer that the real motive behind Defendant's aggressive letter of July 30 was to intimidate Plaintiff into withdrawing his efforts to obtain reasonable accommodation and remote work, and not to admonish him for misconduct. Defendant knew no misconduct took place, and that Harris could not legitimately be blamed for it having to find someone else to work the training.

At this point, it is fruitful to recall that the July 30 letter was extremely hostile, and demanded that Plaintiff return from out of state *that very same day* or be presumed to have resigned. (A311-12). Defendant's hostility and setting of an unattainable same-day deadline for return to the service area bespeak a retaliatory motive. Kelley v. Corr. Med. Servs., 707 F.3d 108, 117 (1st Cir. 2013); Kinzer, 99 F.4th at 118-119; Willnerd v. First Nat'l Neb., Inc., 588 F.3d 770, 779 (8th Cir. 2009) ("the imposition of an unattainable goal" or an "effort to set up an employee

8

for failure" probative of pretext). It is also important to recall that when Plaintiff raised with Defendant its *own* temporary remote work and quarantine policies, Defendant refused to squarely address these points. (A1442-45,A988-92). It just ignored these facts that completely exonerated Plaintiff. Consequently, a jury could determine that these allegations of "misconduct" was a set-up motivated by retaliatory animus.

C.    THE DECISION TO TERMINATE WAS NOT MADE AS OF JULY 30

The next decaying pillar of the Defendant's now-tipping argument is that, according to it, the "decision to take the adverse action occurred [on July 30, 2020] before the protected activity." *Opposition*, at 18-19. According to Defendant, Plaintiff was permitted to work remotely after July 30, "while he considered severance and pursued his accommodation request." *Opposition*, at 10. Thus, according to the Defendant, anything that occurred after July 30 was merely momentum for its already existing and never-flagging default determination, as of July 30, to fire Plaintiff. Id.

However, there is a wealth of evidence that no actual decision to discharge Plaintiff had been made as of July 30. Dunn herself confirms by her testimony that the termination decision was made on or after August 7, 2020:

Q.        So far as you know, on August 7th when you were providing Sandy
          materials and resources to help him apply for FMLA, had a decision
          to terminate Sandy been made?

9

Dunn:      I wouldn't say the decision had been made, no.

Q.         Why would you say that a decision had not been made by that point in time?

Dunn:      Again, our purpose was to get him to come back to the franchise to his job. Replacing and training people is never a path business wants to go down. But now he's raised some FMLA medical issues, and we would want to see that through.

(A994).  Thus, Dunn's testimony is that as of August 7, 2020, Defendant was still trying to get Plaintiff to "come back to the franchise" *on-site*, and earnestly providing him materials about a potential FMLA leave. Id. This testimony demonstrates as pretextual the assertion that Defendant permitted Plaintiff to continue working in August only as a courtesy while he either negotiated severance or pursued his reasonable accommodation request. *Opposition*, at 10. According to Dunn's testimony, Defendant was still actively interested in employing Plaintiff, irrespective of the factors of severance and reasonable accommodation requests.

Dunn's testimony demonstrates that, as of August 7, Defendant was permitting Plaintiff to work remotely while trying to figure out a way for him to get back to in-person work. (A994). Such a course of action is completely inconsistent with Defendant's assertion that the termination decision was finalized as of July 30, based on unforgivable misconduct.

One of Plaintiff's statement of facts, filed with the summary judgment papers, states: "There were no plans to terminate Harris at this point in time. [August 7, 2020]." (A1445).

Defendant's response to this statement of fact was:

**DEFENDANT'S RESPONSE:** Not disputed for purposes of this motion that Ms. Dunn testified that a decision had not been made to terminate Plaintiff's employment on August 6, 2020."

(A1446). The Defendant's response is in red typeface in the original. It is the only portion of the consolidated statement of facts in red typeface. This evidence is consistent with, and independently bolsters, the point in the previous section, that Defendant did not actually believe that Plaintiff engaged in misconduct, much less terminable misconduct, when he failed to attend the July 28 and 29 trainings. Thus, there was no termination decision made on July 30, 2020, or even by August 6.

Defendant engages in double-speak, claiming that, "Although there may have been a later meeting deciding when to implement the termination decision (after National Grid gave Plaintiff the opportunity to support his post-decision request for accommodation), the key *decision about the consequences* of Plaintiff's conduct was made and communicated to Plaintiff (in Dunn's July 30 letter) before his protected activity." *Opposition*, at 23 (emphasis added).

But National Grid's own witnesses refute National Grid's arguments. In addition to testifying that no termination decision had been made even as late as

11

August 7, Dunn testified that the decision matrix was not an "either/or," where Plaintiff had to either submit medical documentation or return to the service area or he "absolutely" would have been fired. (A1012, A994).

A reasonable finder of fact could infer, based on Dunn's clear testimony, that as of July 30, Defendant had made no decision to terminate Harris. That decision occurred after August 6, and only after Plaintiff refused to relent and formalized his request for reasonable accommodation with medical.

D.    THE JULY 30 THREAT WAS DISTINGUISHABLE FROM THE AUGUST 19 TERMINATION

As shown above, the July 30 threat was lodged in response to Plaintiff's July 22 and 28 requests for reasonable accommodation, which Defendant *understood* to be requests for reasonable accommodation. The sequencing of events and Defendant's hostility bluntly demonstrates retaliatory animus towards Plaintiff's protected conduct. However, even if we assume that Plaintiff's requests of July 22 and July 28 were not protected, a jury could still find that the August 19 termination was motivated by a retaliatory mindset, rather than merely being the delayed implementation of the July 30 threat.

Where the later termination can be considered distinguishable from the earlier threat, then a retaliatory motive may properly be ascribed to the later termination. Woodson v. Scott Paper Co., 109 F.3d 913, 921-22 (3d Cir. 1997) (written recommendation, as part of formal evaluation, that employee work with an

12

outside consultant to improve could be found to be retaliatory even when an informal, verbal recommendation was made earlier).

For example, in one case, where an employer adopted a policy prohibiting employees from wearing "Black Lives Matter" masks, and an employee, who complained of discrimination, was disciplined for wearing such a mask, the later discipline may be considered retaliatory where the motive for doing so differs from the motive behind the original policy. Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 118 (1st Cir. 2024) (plaintiff could "differentiate" enforcement of policy that began prior to plaintiff's protected conduct, based on the later discretionary decision to impose a severe punishment).

Furthermore, where an employer proceeds along lines previously contemplated, its later conduct can be considered retaliatory where its prior contemplated plan was conditional and not definitive. Fournier v. Mass., 2021 U.S. App. Lexis 27676 (1st Cir.), at 8-9.

Massachusetts courts administering c. 151B cases likewise consider later conduct retaliatory when it is fairly distinguishable from similar conduct occurring prior to the plaintiff's protected conduct. Charles v. Leo, 96 Mass. App. 326, 338 (2019) (affirming denial of a JNOV motion on a retaliation claim where plaintiff was further marginalized from her program responsibilities after complaining of discrimination); Romano v. Lawrence, 2025 Mass. App. Unpub. Lexis 607, at 11-

13

13 (where employer removed supervisor's authority and then continued to withhold it after Romano engaged in protected conduct, the later withholding was properly deemed retaliatory, as by then, the employer understood that supervisor authority was properly Romano's to wield).

Here, the earlier, so-called determination of July 30 was conditional and was not final. A712 ("it wasn't at any point that we woke up and said, 'Oh, we're going to terminate Mr. Harris.' We gave him all the opportunities to come back."). Dunn's testimony was that, as of August 7, 2020, Defendant's goal was to bring Plaintiff back to work. (A994). Such a goal is inconsistent with Defendant's current position that, as of August 7, termination was a fait accompli.

For example, if, as of August 7, Plaintiff decided that he would give up his efforts for reasonable accommodation, and come back to work on-site, the *controlling* evidence at this stage is that Defendant would have happily allowed him to return and continue indefinitely. Id.; see also A712 (between July 28, 2020 and August 18, 2020, "if he had come back, we would not have terminated him"). Consequently, a jury could find that the decision to terminate did not occur on or before July 30, and that the decision to terminate Harris on August 19 was distinguishable from the events of July in a fundamental way.

14

However, Plaintiff did not voluntarily return, having decided to pursue the reasonable accommodations of remote work, or in the alternative, FMLA leave. Thus, a jury could find that it was these efforts that led to his termination.

We know that retaliation became Defendant's guiding motive. We reach this reasonable conclusion by eliminating other potential reasons. First, Defendant does not allege that Plaintiff engaged in any misconduct after July 29.  Dombrowski testified that Harris did not engage in misconduct by remaining outside the service area:

Q.         And are you aware of Sandy [Harris] defying any managerial
           instructions to return to work in Massachusetts and, if so, by whom?

MS. BURTON: Objection.

DOMBROWSKI: I'm not aware of him defying instructions to work in
                Massachusetts.

(A887). Dunn herself directed that Plaintiff be assigned remote work in August. (A1440-42, A585-86, A982). So, no continued perception of misconduct could possibly have motivated Defendant's post-August 6 decision.

Second, while Defendant claims that it fired Plaintiff due to his failure to return to work on-site (A712), that has been shown to be pretextual. Defendant terminated Plaintiff instead of denying his request for reasonable accommodation, upon which condition Plaintiff had announced he would "drive to MA immediately."  (A1231-1232). Thus, Defendant's anger at the request for

15

reasonable accommodation may be found to have trumped its desire for Plaintiff to return to work on-site.

Third, Defendant did not terminate Plaintiff because he missed the deadline for providing medical documentation. We know that, because Defendant gave no warning and had a policy of flexibility relating to that deadline. (A1454,A1157,A1455,A1155,A1239-1247).

Fourth, Defendant claims to have permitted Plaintiff to remain working off-site in order to facilitate his request for reasonable accommodation. *Opposition*, pp. 10. But, if Defendant actually believed that Plaintiff had engaged in an unforgivable act of misconduct as of July 29, it makes no sense to permit an employee who has engaged in terminable misconduct to pursue a reasonable accommodation with respect to future work.

So why did Defendant decide, after August 6, to terminate Plaintiff? Dunn agreed that "Mr. Harris' refusal to return to the franchise area for work was the only reason for terminating him." (A1000). Irani-Famili likewise asserted that the August 19 termination letter was sent because "Mr. Harris did not return to the service area." (A59,A718). Irani-Famili further testified that "it wasn't at any point that we woke up and said, Oh, we're going to terminate Mr. Harris. We gave him all the opportunities to come back." **(**A712).

16

Terminating Plaintiff for failing to return on-site after July 30 is merely the other side of the same coin as terminating him for lodging requests for reasonable accommodation. As of August 19, the only thing preventing Plaintiff's return to work on-site was the pendency of his requests and inquiries for reasonable accommodation. Indeed, his request for reasonable accommodation was never formally denied.

Hence, we can easily distinguish the July 30 threat, which was *before* the decision to terminate, before Plaintiff formalized his request for reasonable accommodation with "medical" and during a time when Defendant was still working to bring Harris back on-site (A994), from the actual decision to terminate of August 18, 2020, which occurred after Plaintiff seriously pursued reasonable accommodation. The evidence shows that the prospect of Plaintiff pursuing those protected endeavors were intolerable to Defendant, which fired Plaintiff to prevent him from perfecting those requests (i.e. firing him the minute he missed a deadline). Thus, the termination on August 19 could reasonably be found distinguishable from the July 30 threat.

IV.   <u>PLAINTIFF DID NOT WAIVE HIS ARGUMENTS WITH RESPECT TO THE SEQUENCING ISSUE</u>

Defendant argues that Plaintiff's appeal should fail because his Principal Brief failed to address the sequencing issue. *Opposition*, at 17. In fact, Plaintiff's brief attacked the sequencing narrative repeatedly, including challenging the

17

assertion that Plaintiff had failed to engage in protected conduct prior to July 30 (*Principal Brief*, at 26, 42), and challenging the idea that Defendant believed that Plaintiff had engaged in misconduct as of July 30 (*Principal Brief*, at 42-45). Plaintiff highlighted the fact that as late as August 6, there were no plans to terminate Plaintiff. *Principal Brief*, at 54. Plaintiff's Brief twice pointed out that his initial request for reasonable accommodation was lodged before the July 30 letter. *Principal Brief*, at 36, 54. Thus, Plaintiff did challenge the sequencing argument in his Principal Brief, and did not waive anything.

V.    THERE WAS NO PATTERN OF MISCONDUCT THAT CAUSED THE TERMINATION

Defendant argues that Plaintiff was terminated on August 19, 2020, in light of a larger pattern of disrespect and a controversy over expenses. *Opposition*, at 26. However, no contemporaneous documentation confirms this story, including Dunn's July 30 email to Harris that Defendant relies on so heavily. (A311-12). Moreover, as Plaintiff discusses in his Principal Brief, these other alleged reasons for termination were expressly denied by Dunn, a decisionmaker. (A1463-64,A1420-71,A1000-1001,A1025).  To the extent that these other incidents did occur, they took place prior to Plaintiff's positive annual review, received on April 2, 2020. (A1420, A814). While Defendant may be dismissive of the significance of performance review, the favorable review was far from an isolated positive note in that timeframe. (*Opposition Brief* at 28). On March 9, 2020, Irani-Famili met with

18

Harris and assured him that he was a great asset to the team, that he had a "bright future" at National Grid and that "good things were coming." (A654, A656, A1041, A1417). At the time, Irani-Famili believed Harris could advance to many roles within the company. (A652, A1418). Jesse Harvey was also conveying "positive sentiment" about Harris in this timeframe. (A560-61, A1421). A reasonable jury could find these positive facts from the spring of 2020 scupper the claim that National Grid would have rested a termination decision on antiquated issues with expense reports and a company phone, which pre-dated this raft of positive feedback. In other words, the past conduct was consistent with Defendant's understanding that Plaintiff was a good employee with an optimistic future at the company.

## VI.    DEFENDANT EXPECTED PLAINTIFF TO FILE A REQUEST FOR FMLA LEAVE

At the time of termination, Defendant expected Harris to pursue an FMLA leave based on his medical condition. Defendant was, in Tess Overdyk's words, on "high alert" for it. (A1458,A1016,A1357).

Dunn herself testified about National Grid's posture regarding Harris' forthcoming FMLA claim:

Q.                   So your understanding at the close of business on August 18, 2020, was that Sedgwick was awaiting any FMLA documentation from Mr. Harris but had not received it; is that correct.

MS. BURTON:     Objection.

DUNN:           That's correct. It was sort of the last hour of the timeline. We were waiting to see if he could produce something.

(A1026).

Clearly, National Grid was anticipating an FMLA request for Harris and it is unlawful to terminate someone because of an anticipated FMLA request. Duckworth v. Pratt & Whitney, Inc., 152 F.3d 1, 10-11 (1st Cir. 1998). The termination was clearly timed to become effective before Harris' expected request could be filed.

## CONCLUSION

A reasonable understanding of the record supports the Plaintiff's claim and contradicts the Defendant's narrative. Defendant's version of event is broken on every level and cannot be squared with the controlling evidence. Plaintiff sought reasonable accommodation before the July 30 letter, there is no way Defendant legitimately believed that Plaintiff had engaged in misconduct as of July 30, Defendant did not determine to fire Plaintiff as of July 30, and the later termination of August 19 was distinguishable from the events of July. That is why the Defendant opposes oral argument in this case. Plaintiff respectfully requests that this Court reverse the district court's grant of summary judgment on Courts III and IV.

20

Respectfully submitted,
Plaintiff-Appellant Sandy Harris,
By His Attorneys,


/s/Alan Crede                              .
Alan Crede (1st Cir. Bar #1195128)
CONFORTO LAW GROUP, P.C.
20 Park Plaza, Suite 1115
Boston, MA 02116
(617)721-9139
crede@confortolaw.com


/s/Robert S. Mantell                       .
Robert S. Mantell (1st Cir. Bar#31754)
LAW OFFICE OF ROBERT S. MANTELL
47 Liberty Ave.
Somerville, MA 02144
(617)470-1033
RMantell@TheEmploymentLawyers.com


September 5, 2025

21

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I hereby certify that this brief complies with the type-volume limitations in Federal Rule of Appellate Procedure 32(a)(7), because it contains 4,402 words, including all citations and footnotes, but excluding the Cover Page, Table of Contents, Table of Authorities, Statement Regarding Oral Argument, Addendum, Certificate of Counsel, Signature Block and Certificate of Service and has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

/s/Alan Crede_____

Dated: September 5, 2025

## CERTIFICATE OF SERVICE

I hereby certify that one ( 1) copy of the following:

REPLY BRIEF

was served upon Appellee's counsel via the Court's ECF/ACMS System, as indicated,

this 5th day of September, 2025, upon the following:

Lisa Stephanian Burton, Esq.
Laurielle Melissa Howe, Esq.
Ogletree Deakins
1 Boston Place
201 Washington Street, Ste 3500
Boston, MA 02108-4403
617-994-5734
lisa.burton@ogletreedeakins.com
laurielle.howe@ogletree.com


Date: September 5, 2025


*/ s / Alan H. Crede*
_____
ALAN H. CREDE, ESQ.
*Attorney for Appellant*

23